# THORNBURGH, ATTORNEY GENERAL OF THE UNITED STATES, ET AL. *v.* ABBOTT ET AL.

No. 87–1344.   Argued November 8, 1988—Decided May 15, 1989

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 420.

*Deputy Solicitor General Bryson* argued the cause for petitioners. With him on the briefs were *Solicitor General Fried, Acting Assistant Attorney General Dennis, Robert H. Klonoff,* and *Andrew Levchuk.*

*Steven Ney* argued the cause for respondents. With him on the brief were *Edward I. Koren, Alvin J. Bronstein,* and *Steven R. Shapiro.**

*Briefs of *amici curiae* urging reversal were filed for the State of Florida et al. by *Robert A. Butterworth,* Attorney General of Florida, and *Jason Vail,* Assistant Attorney General, and *Robert R. Gates,* Deputy Attorney General of Idaho; and for the State of Missouri et al. by *William L. Webster,* Attorney General of Missouri, and *Kelly Mescher,* Assistant Attorney General, *Steve Clark,* Attorney General of Arkansas, *James T. Jones,* Attorney General of Idaho, and *W. J. Michael Cody,* Attorney General of Tennessee.

Briefs of *amici curiae* urging affirmance were filed for the Association of American Publishers, Inc., et al. by *R. Bruce Rich;* and for the Correctional Association of New York by *John Boston* and *William J. Rold.*

JUSTICE BLACKMUN delivered the opinion of the Court.

I

Regulations promulgated by the Federal Bureau of Prisons broadly permit federal prisoners to receive publications from the "outside," but authorize prison officials to reject incoming publications found to be detrimental to institutional security.[1] For 15 years, respondents, a class of inmates and certain publishers, have claimed that these regulations violate their First Amendment rights under the standard of review enunciated in *Procunier* v. *Martinez*, 416 U. S. 396 (1974).[2] They mount a facial challenge to the regulations as well as a challenge to the regulations as applied to 46 specific publications excluded by the Bureau.

After a 10-day bench trial, the District Court refrained from adopting the *Martinez* standard. Instead, it favored an approach more deferential to the judgment of prison authorities and upheld the regulations without addressing the propriety of the 46 specific exclusions. App. to Pet. for Cert. 26a, 43a–47a. The Court of Appeals, on the other hand, utilized the *Martinez* standard, found the regulations wanting,

---

[1] As explained in the text, rejection of a publication is authorized "only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." 28 CFR § 540.71(b) (1988). References in the text to "prison security" are intended, for the sake of convenience, to refer more broadly to this range of concerns.

[2] This lawsuit was filed by prisoners in May 1973 and was certified the following year as a class action. In 1978, three publishers, The Prisoners' Union, Weekly Guardian Associates, and The Revolutionary Socialist League, were added as party plaintiffs. The suit also challenged several prison practices, largely concerning inmate correspondence, that are not at issue here. Individual claims for damages were severed in 1979. A bench trial on the claims for injunctive relief took place in 1981, and a memorandum opinion and accompanying order were issued by the District Court in September 1984. The Court of Appeals predicated its jurisdiction on 28 U. S. C. § 1292(a)(1) on the ground that the order of the District Court denied respondents injunctive relief. *Abbott* v. *Meese*, 263 U. S. App. D. C. 186, 187–188, 824 F. 2d 1166, 1167–1168 (1987).

and remanded the case to the District Court for an individualized determination of the constitutionality of the 46 exclusions. *Abbott* v. *Meese*, 263 U. S. App. D. C. 186, 824 F. 2d 1166 (1987).

Petitioners, officials of the Department of Justice and the Bureau of Prisons, sought certiorari. We granted the writ in order to determine the appropriate standard of review. *Meese* v. *Abbott*, 485 U. S. 1020 (1988).

We now hold that the District Court correctly anticipated that the proper inquiry in this case is whether the regulations are "reasonably related to legitimate penological interests," *Turner* v. *Safley*, 482 U. S. 78, 89 (1987), and we conclude that under this standard the regulations are facially valid. We therefore disagree with the Court of Appeals on the issue of facial validity, but we agree with that court's remand of the case to the District Court for a determination of the validity of the regulations as applied to each of the 46 publications.

## II

We are concerned primarily with the regulations set forth at 28 CFR §§ 540.70 and 540.71 (1988), first promulgated in 1979.[3] These generally permit an inmate to subscribe to, or to receive, a publication without prior approval,[4] but authorize the warden to reject a publication in certain circumstances. The warden may reject it "only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity."

---

[3] When the complaint was filed in 1973, the Bureau had not yet issued regulations dealing with management of federal inmates. See 43 Fed. Reg. 30574 (1978) (proposed rulemaking); 44 Fed. Reg. 38254 (1979) (final rules). References herein to regulations are to those presently in effect. They are identical to the version considered by the District Court and the Court of Appeals. The current version differs in some respects from the 1979 version, but those differences are not material to our present inquiry.

[4] The term "publication" is defined as "a book (for example, novel, instructional manual), or a single issue of a magazine or newspaper, plus such other materials addressed to a specific inmate as advertising brochures, flyers, and catalogues." 28 CFR § 540.70(a) (1988).

§ 540.71(b). The warden, however, may not reject a publication "solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant." *Ibid.* The regulations contain a nonexhaustive list of criteria which may support rejection of a publication.[5] The warden is prohibited from establishing an excluded list of publications: each issue of a subscription publication is to be reviewed separately. § 540.71(c). The regulatory criteria for rejecting publications have been supplemented by Program Statement No. 5266.5, which provides further guidance on the subject of sexually explicit material.[6]

_____

[5] Section 540.71(b) reads:

". . . Publications which may be rejected by a Warden include but are not limited to publications which meet one of the following criteria:

"(1) It depicts or describes procedures for the construction or use of weapons, ammunition, bombs or incendiary devices;

"(2) It depicts, encourages, or describes methods of escape from correctional facilities, or contains blueprints, drawings or similar descriptions of Bureau of Prisons institutions;

"(3) It depicts or describes procedures for the brewing of alcoholic beverages, or the manufacture of drugs;

"(4) It is written in code;

"(5) It depicts, describes or encourages acuvities which may lead to the use of physical violence or group disruption;

"(6) It encourages or instructs in the commission of criminal activity;

"(7) It is sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity."

[6] The Program Statement was promulgated on January 2, 1985, in response to a lawsuit brought by the National Gay Task Force. See App. to Pet. for Cert. 30a (opinion of District Court). By ¶ (a) of the statement, a warden may reject the following types of sexually explicit material pursuant to 28 CFR § 540.71(b)(7) (see n. 5, *supra*):

"(1) Homosexual (of the same sex as the institution population).

"(2) Sado-masochistic.

"(3) Bestiality.

"(4) Involving children."

Material in categories (1), (2), and (3) may be admitted if the warden determines it "not to pose a threat at the local institution." ¶ (b)(1). Explicit heterosexual material ordinarily will be admitted. ¶ (b)(2). Other ex-

The regulations provide procedural safeguards for both the recipient and the sender. The warden may designate staff to screen and, where appropriate, to approve incoming publications, but only the warden may reject a publication. § 540.70(b). The warden must advise the inmate promptly in writing of the reasons for the rejection, § 540.71(d), and must provide the publisher or sender with a copy of the rejection letter, § 540.71(e). The notice must refer to "the specific article(s) or material(s) considered objectionable." § 540.71(d). The publisher or sender may obtain an independent review of the warden's rejection decision by a timely writing to the Regional Director of the Bureau. § 540.71(e). An inmate may appeal through the Bureau's Administrative Remedy Procedure. See §§ 542.10 to 542.16.[7] The warden is instructed to permit the inmate to review the rejected material for the purpose of filing an appeal "unless such review may provide the inmate with information of a nature which is deemed to pose a threat or detriment to the security, good order or discipline of the institution or to encourage or instruct in criminal activity." § 540.71(d).[8]

---

plicit material may be admitted if it has scholarly, or general social or literary, value. ¶ (b)(5). Homosexual material that is not sexually explicit is to be admitted; this includes a publication covering the activities of gay-rights groups or gay religious groups, ¶ (b)(3), and literary publications with homosexual themes or references, ¶ (b)(4). See 263 U. S. App. D. C., at 197, 824 F. 2d, at 1177.

[7] Under the Administrative Remedy Procedure, a prisoner who has been unable informally to resolve his difficulty may file a formal written complaint. 28 CFR § 542.13(b) (1988). If the inmate believes he would be adversely affected if the complaint became known at the prison, he may file the complaint with the Regional Director of the Bureau. § 542.13(c). The warden or Regional Director is to respond within 15 or 30 days, respectively. § 542.14. An adverse decision by the Regional Director may be appealed to the General Counsel of the Bureau; an adverse decision by the warden may be appealed to the Regional Director. § 542.15.

[8] Although the regulations do not so provide, it is the practice of the Bureau to withhold in its entirety any publication containing excludable

## III

There is little doubt that the kind of censorship just described would raise grave First Amendment concerns outside the prison context. It is equally certain that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner* v. *Safley*, 482 U. S., at 84, nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the "inside," *id.*, at 94–99; *Bell* v. *Wolfish*, 441 U. S. 520 (1979); *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, 433 U. S. 119 (1977); *Pell* v. *Procunier*, 417 U. S. 817 (1974). We have recognized, however, that these rights must be exercised with due regard for the "inordinately difficult undertaking" that is modern prison administration. *Turner* v. *Safley*, 482 U. S., at 85.

In particular, we have been sensitive to the delicate balance that prison administrators must strike between the order and security of the internal prison environment and the legitimate demands of those on the "outside" who seek to enter that environment, in person or through the written word. Many categories of noninmates seek access to prisons. Access is essential to lawyers and legal assistants representing prisoner clients, see *Procunier* v. *Martinez*, 416 U. S. 396 (1974), to journalists seeking information about prison conditions, see *Pell* v. *Procunier, supra*, and to families and friends of prisoners who seek to sustain relationships with them, see *Procunier* v. *Martinez, supra*. All these claims to prison access undoubtedly are legitimate; yet prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is "ill equipped" to deal with the difficult

---

material. This practice, referred to by the parties as the "all-or-nothing rule," is also at issue in this case.

and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world. *Id.*, at 404–405.

In this case, there is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners. The question here, as it has been in our previous First Amendment cases in this area, is what standard of review this Court should apply to prison regulations limiting that access.

*Martinez* was our first significant decision regarding First Amendment rights in the prison context. There, the Court struck down California regulations concerning personal correspondence between inmates and noninmates, regulations that provided for censorship of letters that "unduly complain," "magnify grievances," or "expres[s] inflammatory political, racial, religious or other views or beliefs." *Id.*, at 399. We reviewed these regulations under the following standard:

> "First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials . . . must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad." *Id.*, at 413–414.

It is clear from this language, however, that we did not deprive prison officials of the degree of discretion necessary to vindicate "the particular governmental interest involved." Accordingly, we said:

> "Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more . . . legitimate governmental interests." *Id.*, at 414.

The Court's subsequent decisions regarding First Amendment rights in the prison context, however, laid down a different standard of review from that articulated in *Martinez*. As recently explained in *Turner*, these later decisions, which we characterized as involving "prisoners' rights," adopted a standard of review that focuses on the reasonableness of prison regulations: the relevant inquiry is whether the actions of prison officials were "reasonably related to legitimate penological interests." 482 U. S., at 89. The Court ruled that "such a standard is necessary if 'prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Ibid.*, quoting *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, 433 U. S., at 128. The Court set forth in *Turner* the development of this reasonableness standard in the respective decisions in *Pell* and *Jones* and in *Block* v. *Rutherford*, 468 U. S. 576 (1984), and we need not repeat that discussion here.

The Court's decision to apply a reasonableness standard in these cases rather than *Martinez'* less deferential approach stemmed from its concern that language in *Martinez* might be too readily understood as establishing a standard of "strict" or "heightened" scrutiny, and that such a strict

standard simply was not appropriate for consideration of regulations that are centrally concerned with the maintenance of order and security within prisons.[9] See *Turner* v. *Safley*, 482 U. S., at 81, 87, 89. Specifically, the Court declined to apply the *Martinez* standard in "prisoners' rights" cases because, as was noted in *Turner*, *Martinez* could be (and had been) read to require a strict "least restrictive alternative" analysis, without sufficient sensitivity to the need for discretion in meeting legitimate prison needs. 482 U. S., at 89–90. The Court expressed concern that "every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way

---

[9] We do not think it sufficient to focus, as respondents urge, on the identity of the individuals whose rights allegedly have been infringed. Although the Court took special note in *Procunier* v. *Martinez*, 416 U. S. 396 (1974), of the fact that the rights of nonprisoners were at issue, and stated a rule in *Turner* v. *Safley*, 482 U. S. 78 (1987), for circumstances in which "a prison regulation impinges on *inmates*' constitutional rights," *id.*, at 89 (emphasis added), any attempt to forge separate standards for cases implicating the rights of outsiders is out of step with the intervening decisions in *Pell* v. *Procunier*, 417 U. S. 817 (1974); *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, 433 U. S. 119 (1977); and *Bell* v. *Wolfish*, 441 U. S. 520 (1979). These three cases, on which the Court expressly relied in *Turner* when it announced the reasonableness standard for "inmates' constitutional rights" cases, all involved regulations that affected rights of prisoners *and* outsiders.

*Pell* involved the right of representatives of the news media to conduct interviews in the prisons in order to inform the public about prison conditions. The asserted right at issue in *Jones* was the right of a prisoners' union to send its literature into the prison. In *Wolfish*, publishers sought to send hardback books into the prison. In all these cases, regulations worked a "consequential restriction on the . . . rights of those who are not prisoners." *Martinez*, 416 U. S., at 409. But the Court in *Turner* observed: "In none of these . . . cases did the Court apply a standard of heightened scrutiny, but instead inquired whether a prison regulation that burdens fundamental rights is 'reasonably related' to legitimate penological objectives, or whether it represents an 'exaggerated response' to those concerns." 482 U. S., at 87.

of solving the problem at hand," *id.*, at 89, and rejected the costs of a "least restrictive alternative" rule as too high. *Id.*, at 90. See also *O'Lone* v. *Estate of Shabazz*, 482 U. S. 342, 350 (1987) (refusing to apply a least restrictive alternative standard for regulation of prisoner work rules having an impact on religious observance).

We do not believe that *Martinez* should, or need, be read as subjecting the decisions of prison officials to a strict "least restrictive means" test. As noted, *Martinez* required no more than that a challenged regulation be "generally necessary" to a legitimate governmental interest. 416 U. S., at 414. Certainly, *Martinez* required a close fit between the challenged regulation and the interest it purported to serve. But a careful reading of *Martinez* suggests that our rejection of the regulation at issue resulted not from a least restrictive means requirement, but from our recognition that the regulated activity centrally at issue in that case—outgoing personal correspondence from prisoners—did not, by its very nature, pose a serious threat to prison order and security.[10] We pointed out in *Martinez* that outgoing correspondence that magnifies grievances or contains inflammatory racial views cannot reasonably be expected to present a danger to

---

[10] *Martinez* has been characterized in subsequent decisions of this Court as a case concerning "written communication by inmates" to noninmate recipients. See *Pell*, 417 U. S., at 826. See also *Houchins* v. *KQED, Inc.*, 438 U. S. 1, 12 (1978) (plurality opinion) (distinguishing *Martinez* as dealing with outsiders' right to *receive* communications from inside the prison, as opposed to outsiders' right to prison access); *id.*, at 31 (dissenting opinion) (noting *Martinez* as a case concerning "excessive censorship of *outgoing* inmate correspondence" (emphasis added)). Indeed, the parties in *Martinez* stressed that the regulation as enforced dealt "with thoughts expressed in prisoner mail to relatives or friends—*mainly outgoing letters, not matters circulated within the walls.*" (Emphasis added.) Brief for Appellees in *Procunier* v. *Martinez*, O. T. 1973, No. 72–1465, p. 29. See also *id.*, at 31; Tr. of Oral Arg. in *Martinez*, pp. 17, 25 ("[T]he issues in this case involve what the prisoners are writing outside of the prison"), 31.

the community *inside* the prison. *Id.*, at 416. In addition, the implications for security are far more predictable. Dangerous outgoing correspondence is more likely to fall within readily identifiable categories: examples noted in *Martinez* include escape plans, plans relating to ongoing criminal activity, and threats of blackmail or extortion. *Id.*, at 412–413. Although we were careful in *Martinez* not to limit unduly the discretion of prison officials to reject even outgoing letters, we concluded that the regulations at issue were broader than "generally necessary" to protect the interests at stake. *Id.*, at 414.[11]

In light of these considerations, it is understandable that the Court in *Martinez* concluded that the regulations there at issue swept too broadly. Where, as in *Martinez*, the nature of the asserted governmental interest is such as to require a lesser degree of case-by-case discretion, a closer fit between the regulation and the purpose it serves may safely be required. Categorically different considerations—considerations far more typical of the problems of prison administration—apply to the case presently before this Court.

We deal here with incoming publications, material requested by an individual inmate but targeted to a general audience. Once in the prison, material of this kind reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct. Furthermore, prisoners may observe particular material in the possession of a fellow prisoner, draw inferences about their fellow's beliefs, sexual orientation, or gang affiliations from that material, and cause disorder by acting accord-

---

[11] To be sure, some of the regulations at issue in *Martinez* applied to *incoming*, as well as outgoing, correspondence. In striking down these regulations as facially overbroad, the Court did not limit its holding to restrictions on outgoing correspondence. But the Court noted that the regulation banning transmission of "inflammatory political, racial, religious or other views" was not "limited to incoming letters." 416 U. S., at 416. This observation suggests that the Court's approach to the regulation might have been different had the regulation been so limited.

ingly. See App. 22–23, 52, 59, 88; see generally Prisoners and the Law 3–14 (I. Robbins ed. 1988) (noting that possession of homosexually explicit material may identify the possessor as homosexual and target him for assault). As the Deputy Solicitor General noted at oral argument: "The problem is not . . . in the individual reading the materials in most cases. The problem is in the material getting into the prison." Tr. of Oral Arg. 10. See also id., at 26; App. 10. In the volatile prison environment, it is essential that prison officials be given broad discretion to prevent such disorder.

In *Turner*, we dealt with incoming personal correspondence from prisoners; the impact of the correspondence on the internal environment of the prison was of great concern. There, we recognized that *Martinez* was too readily understood as failing to afford prison officials sufficient discretion to protect prison security. In light of these same concerns, we now hold that regulations affecting the sending of a "publication" (see the regulations' specific definition of this word, n. 4, *supra*) to a prisoner must be analyzed under the *Turner* reasonableness standard. Such regulations are "valid if [they are] reasonably related to legitimate penological interests." *Turner*, 482 U. S., at 89.

Furthermore, we acknowledge today that the logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence. As we have observed, outgoing correspondence was the central focus of our opinion in *Martinez*. The implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials. Any attempt to justify a similar categorical distinction between incoming correspondence from prisoners (to which we applied a reasonableness standard in *Turner*) and incoming correspondence from nonprisoners would likely prove futile, and we do not invite it. To the extent that *Martinez* itself suggests such a distinction, we today overrule

that case; the Court accomplished much of this step when it decided *Turner*.

In so doing, we recognize that it might have been possible to apply a reasonableness standard to all incoming materials without overruling *Martinez:* we instead could have made clear that *Martinez* does not uniformly require the application of a "least restrictive alternative" analysis. We choose not to go that route, however, for we prefer the express flexibility of the *Turner* reasonableness standard. We adopt the *Turner* standard in this case with confidence that, as petitioners here have asserted, "a reasonableness standard is not toothless." Pet. for Cert. 17, n. 10.

### IV

The Court in *Turner* identified several factors that are relevant to, and that serve to channel, the reasonableness inquiry.

The first *Turner* factor is multifold: we must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective. We agree with the District Court that this requirement has been met.[12]

---

[12] The District Court in the present case stated its standard of review: "the Bureau [must] articulate a relationship between its regulations (and practices) and legitimate penological objectives such as internal security. Once the Bureau meets that requirement, the plaintiffs must show by 'substantial evidence' that the defendants have 'exaggerated their response' to the problems the regulations address." App. to Pet. for Cert. 46a–47a (citing, among other cases, *St. Claire* v. *Cuyler*, 634 F. 2d 109, 114 (CA3 1980)). The District Court did not have the benefit of this Court's decision in *Turner*, and the standard of review it applied is not precisely identical to the *Turner* standard. In particular, it is by no means certain what the District Court meant by "substantial evidence." We do not pass on any question of evidentiary burdens or burden shifting here, but we conclude that the standard applied by the District Court is sufficiently close to the *Turner* standard for present purposes to permit reliance on the District Court's findings.

The legitimacy of the Government's purpose in promulgating these regulations is beyond question. The regulations are expressly aimed at protecting prison security, a purpose this Court has said is "central to all other corrections goals." *Pell* v. *Procunier*, 417 U. S., at 823.

As to neutrality, "[w]e have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." *Turner*, 482 U. S., at 90. The ban on *all* correspondence between certain classes of inmates at issue in *Turner* clearly met this "neutrality" criterion, as did the restrictions at issue in *Pell* and *Wolfish*. The issue, however, in this case is closer.

On their face, the regulations distinguish between rejection of a publication "solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant" (prohibited) and rejection because the publication is detrimental to security (permitted). 28 CFR § 540.71(b)(1988). Both determinations turn, to some extent, on content. But the Court's reference to "neutrality" in *Turner* was intended to go no further than its requirement in *Martinez* that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." 416 U. S., at 413.[13] Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regula-

---

[13] Indeed, the Court upheld content distinctions in *Jones*, where internal distribution of a prisoners' union's materials was prohibited while distribution of materials from the Jaycees and Alcoholics Anonymous was permitted. 433 U. S., at 131, n. 8. It upheld these distinctions against an equal protection challenge because the distinctions had a rational basis in the legitimate penological interests of the prisons: in contrast with the prisoners' union, the Jaycees and Alcoholics Anonymous "were seen as serving a rehabilitative purpose, working in harmony with the goals and desires of the prison administrators, and both had been determined not to pose any threat to the order or security of the institution." *Id.*, at 134.

tions are "neutral" in the technical sense in which we meant and used that term in *Turner*.[14]

We also conclude that the broad discretion accorded prison wardens by the regulations here at issue is rationally related to security interests. We reach this conclusion for two reasons. The first has to do with the kind of security risk presented by incoming publications. This has been explored above in Part III. The District Court properly found that publications can present a security threat, and that a more closely tailored standard "could result in admission of publications which, even if they did not lead directly to violence, would exacerbate tensions and lead indirectly to disorder." App. to Pet. for Cert. 32a. Where the regulations at issue concern the entry of materials into the prison, we agree with the District Court that a regulation which gives prison authorities broad discretion is appropriate.

Second, we are comforted by the individualized nature of the determinations required by the regulation. Under the regulations, no publication may be excluded unless the warden himself makes the determination that it is "detrimental to the security, good order, or discipline of the institution or . . . might facilitate criminal activity." 28 CFR §§ 540.70(b), 540.71(b) (1988). This is the controlling standard. A publication which fits within one of the "criteria" for exclusion *may* be rejected, but only if it is determined to meet that standard under the conditions prevailing at the institution

---

[14] In contrast, the censorship at issue in *Martinez* closely resembled the kind of censorship which is expressly *prohibited* by the regulations presently at issue. In *Martinez*, the regulations barred writings that "unduly complain" or "magnify grievances," express "inflammatory political, racial, religious or other views," or are "defamatory" or "otherwise inappropriate." 416 U. S, at 415. We found in *Martinez* that "[t]hese regulations fairly invited prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner mail censorship," and that the purpose of the regulations had not been found "unrelated to the suppression of expression." *Ibid.* The regulations at issue in *Martinez*, therefore, were decidedly not "neutral" in the relevant sense.

at the time. Indeed, the regulations expressly reject certain shortcuts that would lead to needless exclusions. See § 540.70(b) (nondelegability of power to reject publications); § 540.71(c) (prohibition against establishing an excluded list of publications). We agree that it is rational for the Bureau to exclude materials that, although not necessarily "likely" to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time.[15]

A second factor the Court in *Turner* held to be "relevant in determining the reasonableness of a prison restriction . . . is whether there are alternative means of exercising the right that remain open to prison inmates." 482 U. S., at 90. As has already been made clear in *Turner* and *O'Lone*, "the right" in question must be viewed sensibly and expansively. The Court in *Turner* did not require that prisoners be afforded other means of communicating with inmates at other institutions, 482 U. S., at 92, nor did it in *O'Lone* require that there be alternative means of attending the Jumu'ah religious ceremony, 482 U. S., at 351. Rather, it held in *Turner* that

---

[15] The exercise of discretion called for by these regulations may produce seeming "inconsistencies," but what may appear to be inconsistent results are not necessarily signs of arbitrariness or irrationality. Given the likely variability within and between institutions over time, see App. to Pet. for Cert. 32a; App. 20–21, 50, greater consistency might be attainable only at the cost of a more broadly restrictive rule against admission of incoming publications. Cf. F. Dostoyevsky, The House of the Dead 40 (Penguin 1985) (prisoners permitted to read only the Bible). Any attempt to achieve greater consistency by broader exclusions might itself run afoul of the second *Turner* factor, *i. e.*, the presence or absence of "alternative means of exercising the right" in question. 482 U. S., at 90. The regulations at issue here, in our view, strike an acceptable balance.

Respondents have argued that the record does not support the conclusion that exclusions are in fact based on particular events or conditions at a particular prison; they contend that variability in enforcement of the regulations stems solely from the censors' subjective views. Brief for Respondents 43–44, n. 37. These contentions go to the adequacy of the regulations as applied, and will be considered on remand.

it was sufficient if other means of expression (not necessarily other means of communicating with inmates in other prisons) remained available, and in *O'Lone* if prisoners were permitted to participate in other Muslim religious ceremonies. As the regulations at issue in the present case permit a broad range of publications to be sent, received, and read, this factor is clearly satisfied.

The third factor to be addressed under the *Turner* analysis is the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison. 482 U. S., at 90. Here, the class of publications to be excluded is limited to those found potentially detrimental to order and security; the likelihood that such material will circulate within the prison raises the prospect of precisely the kind of "ripple effect" with which the Court in *Turner* was concerned. Where, as here, the right in question "can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike," *id.*, at 92, the courts should defer to the "informed discretion of corrections officials," *id.*, at 90.

Finally, *Turner* held: "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns. . . . But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." 482 U. S., at 90–91. We agree with the District Court that these regulations, on their face, are not an "exaggerated response" to the problem at hand: no obvious, easy alternative has been established.

Regarding the all-or-nothing rule, we analyze respondents' proposed alternatives to that rule as alternative means of accommodating respondents' asserted rights. The District Court discussed the evidence and found, on the basis of testimony in the record, that petitioners' fear that tearing out the

rejected portions and admitting the rest of the publication would create more discontent than the current practice was "reasonably founded." App. to Pet. for Cert. 34a. The Court of Appeals did not contest the District Court's factual finding as such, but ruled that upholding a practice merely because it is based upon "reasonably founded" fears is improper under *Martinez:* the Court of Appeals held that this finding "conflicts with the holding of *Martinez* that prison administrators have the burden of showing that a restrictive practice is 'generally necessary.'" 263 U. S. App. D. C., at 194, 824 F. 2d, at 1174.

As we here do not apply the *Martinez* standard, we reject the Court of Appeals' sole ground for questioning the District Court's findings in this respect. In our view, when prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an "exaggerated response" under *Turner.* Furthermore, the administrative inconvenience of this proposed alternative is also a factor to be considered and adds additional support to the District Court's conclusion that petitioners were not obligated to adopt it. See *Wolfish,* 441 U. S., at 549.

## V

In sum, we hold that *Turner*'s reasonableness standard is to be applied to the regulations at issue in this case, and that those regulations are facially valid under that standard. We agree with the remand for an examination of the validity of the regulations as applied to any of the 46 publications introduced at trial as to which there remains a live controversy. See 263 U. S. App. D. C., at 196, 824 F. 2d, at 1176.

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in part and dissenting in part.

An article in Labyrinth, a magazine published by the Committee for Prisoner Humanity & Justice, began as follows:

> "In January 1975, William Lowe, a black prisoner at the United States Penitentiary at Terre Haute, Indiana died of asthma. . . . In August 1975, Joseph (Yusef) Jones, Jr., a black prisoner at the U. S. Penitentiary, Terre Haute, IN. died of asthma.
>
> ". . . The prison infirmary at that time had only one respirator[,] known to be inoperative in January 1975 when William Lowe died. It was still broken in August 1975 when Joseph Jones needed it.
>
> "On the day of his death Jones was suffering an acute asthma attack; he was gasping for breath in the stale, hot, humid air in the cell. He requested medical aid of the guards. After several hours of unheeded pleading, accompanied by complaints to the guards from fellow prisoners in the cell block, Jones became frantic. Each breath was painful; each breath brought him closer to suffocation. Finally, guards called the PA (physician's assistant) . . . , who brought with him the broken respirator. Finding the equipment unusable, the PA gave Jones an injection of the tranquilizer, thorazine, to calm him. Treatment with a tranquilizer was unquestionably contraindicated by Jones' medical condition. Twenty minutes later, Jones was dead.
>
> .       .       .       .       .
>
> "*Conclusion:* Jones, who was convicted of bank robbery and sentenced to 10 years in prison, was in fact, sentenced to death and was *murdered by neglect.*"[1]

---

[1] Medical Murder, 4 Labyrinth 5 (Apr. 1977) (emphasis in original), reprinted in Joint Lodging 18 (J. L.).

The incident described above eventually came to the attention of this Court, which allowed Jones' mother to pursue her civil rights action against prison officials. *Carlson* v. *Green*, 446 U. S. 14 (1980). Clearly the Labyrinth article's report of inadequate medical treatment of federal prisoners raised "a matter that is both newsworthy and of great public importance." *Pell* v. *Procunier*, 417 U. S. 817, 830, n. 7 (1974). As the Court concedes, *ante*, at 407, both publishers and recipients of such criticism ordinarily enjoy the fullest First Amendment protections.[2] See *Pell*, *supra*, at 822; *Martin* v. *Struthers*, 319 U. S. 141, 146–147 (1943).

Yet Labyrinth's efforts to disseminate the article to its subscribers at Marion Federal Penitentiary met Government resistance. Marion officials, acting within Federal Bureau of Prisons (Bureau) regulations,[3] returned the magazine on the ground that "the article entitled 'Medical Murder' would be detrimental to the good order and discipline of this institution . . . . [T]his type of philosophy could guide inmates in this institution into situations which could cause themselves and other inmates problems with the Medical Staff." J. L. 12. Two years after publication a Marion official testified that he

---

[2] This Court has recognized:

"[S]peech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Garrison* v. *Louisiana*, 379 U. S. 64, 74–75 (1964) (quoting *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964)).

See also *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 50–51 (1988); *Thornhill* v. *Alabama*, 310 U. S. 88, 101–102 (1940).

[3] In part, the regulations state that the "Bureau of Prisons permits an inmate to subscribe to or to receive publications without prior approval . . . ." 28 CFR § 540.70(a) (1988). "The Warden may reject a publication only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." § 540.71(b).

believed the article had posed no threat.    App. 104.    None-
theless, the District Court below found the suppression of
this and 45 other publications "reasonable," and thus sus-
tained the rejections wholesale.    App. to Pet. for Cert.
28a–34a, 47a.    This Court holds today that such *carte
blanche* deference was improper and remands for case-by-
case review.    I agree with this aspect of the Court's decision.
I cannot agree, however, with either its holding that another
finding of "reasonableness" will justify censorship or its pre-
mature approval of the Bureau's regulations.    These latter
determinations upset precedent in a headlong rush to strip
inmates of all but a vestige of free communication with the
world beyond the prison gate.[1]

I

This Court first addressed the First Amendment in the
prison context in *Procunier* v. *Martinez*, 416 U. S. 396
(1974).    Prior lower court treatments had varied: some
courts had maintained "a hands-off posture," while others
had required "demonstration of a 'compelling state interest'
to justify censorship of prisoner mail."    *Id.*, at 406.    With
characteristic wisdom Justice Powell, in his opinion for the
Court, rejected both extremes.    The difficulties of prison ad-
ministration, he perceived, make the strict scrutiny that the
First Amendment demands in other contexts inappropriate.[5]

[1] See *Procunier* v. *Martinez*, 416 U. S. 396, 422 (1974) (MARSHALL, J.,
concurring) ("A prisoner does not shed . . . basic First Amendment rights
at the prison gate").    See also *Turner* v. *Safley*, 482 U. S. 78, 84 (1987);
*Pell* v. *Procunier*, 417 U. S. 817, 822 (1974); *Coffin* v. *Reichard*, 143 F. 2d
443, 445 (CA6 1944) *(per curiam)*.

[5] "Suffice it to say that the problems of prisons in America are complex
and intractable, and, more to the point, they are not readily susceptible of
resolution by decree.    Most require expertise, comprehensive planning,
and the commitment of resources, all of which are peculiarly within the
province of the legislative and executive branches of government.    For all
of those reasons, courts are ill equipped to deal with the increasingly ur-
gent problems of prison administration and reform."    *Martinez*, 416 U. S.,
at 404–405.

See, *e. g.*, *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 786 (1978); *Elrod* v. *Burns*, 427 U. S. 347, 362 (1976) (opinion of BRENNAN, J.); *Brandenburg* v. *Ohio*, 395 U. S. 444, 447 (1969) *(per curiam)*. Focusing not on the rights of prisoners, but on the "inextricably meshed" rights of nonprisoners "who have a particularized interest in communicating with them," he wrote that an "undemanding standard of review" could not be squared with the fact "that the First Amendment liberties of free citizens are implicated in censorship of prisoner mail." *Martinez, supra,* at 408, 409. Thus he chose an "intermediate" means of evaluating speech restrictions, 416 U. S., at 407, allowing censorship if it "further[ed] an important or substantial governmental interest unrelated to the suppression of expression," and "the limitation of First Amendment freedoms [was] no greater than [was] necessary or essential," *id.,* at 413. "Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements," Justice Powell stressed. *Ibid.* Censorship might be permitted, however, to ensure "the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." *Id.,* at 412 (footnote omitted). Prison administrators did not have "to show with certainty that adverse consequences would flow from the failure to censor a particular letter," but "any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more of the legitimate governmental interests identified above." *Id.,* at 414.[6]

In the 15 years since *Martinez* was decided, lower courts routinely have applied its standard to review limitations not only on correspondence between inmates and private citi-

---

[6] It is obvious that *Martinez* calls for less than strict scrutiny, and the Court today correctly rejects petitioners' argument to the contrary. Compare *ante,* at 409–411, with Brief for Petitioners 18–22; Reply Brief for Petitioners 1–10.

zens, but also on communications—such as the newsletters, magazines, and books at issue—between inmates and publishers.[7]   Carefully examining free speech rights and countervailing governmental interests, these courts approved some restrictions and invalidated others.[8]   This Court thus correctly recognizes that *Martinez*'s standard of review does not deprive prison officials of the discretion necessary to perform their difficult tasks.   *Ante*, at 409.   Inexplicably, it then partially overrules *Martinez* by limiting its scope to outgoing mail; letters and publications sent to prisoners now are subject only to review for "reasonableness."   *Ante*, at 413–414.

This peculiar bifurcation of the constitutional standard governing communications between inmates and outsiders is unjustified.   The decision in *Martinez* was based on a distinction between prisoners' constitutional rights and the protection the First Amendment affords those who are not prisoners—not between nonprisoners who are senders and those who are receivers.   As Justice Powell explained:

> "Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech.   And this does not depend on whether the nonprisoner correspondent is the author or intended recipient of a particular letter, for

[7] See, *e. g.*, *Lawson* v. *Dugger*, 840 F. 2d 781 (CA11 1987), reh'g denied, 840 F. 2d 779 (1988) *(per curiam)*, cert. pending, No. 87–1994; *Valiant-Bey* v. *Morris*, 829 F. 2d 1441 (CA8 1987); *Murphy* v. *Missouri Dept. of Corrections*, 814 F. 2d 1252 (CA8 1987); *Pepperling* v. *Crist*, 678 F. 2d 787 (CA9 1982); *Trapnell* v. *Riggsby*, 622 F. 2d 290 (CA7 1980); *Brooks* v. *Seiter*, 779 F. 2d 1177 (CA6 1985); *Guajardo* v. *Estelle*, 580 F. 2d 748 (CA5 1978); *Aikens* v. *Jenkins*, 534 F. 2d 751 (CA7 1976); *Morgan* v. *LaVallee*, 526 F. 2d 221 (CA2 1975).

[8] See, *e. g.*, *Espinoza* v. *Wilson*, 814 F. 2d 1093 (CA6 1987); *Travis* v. *Norris*, 805 F. 2d 806 (CA8 1986); *Meadows* v. *Hopkins*, 713 F. 2d 206, 211 (CA6 1983); *Vodicka* v. *Phelps*, 624 F. 2d 569 (CA5 1980); *Carpenter* v. *South Dakota*, 536 F. 2d 759 (CA8 1976), cert. denied, 431 U. S. 931 (1977).

the addressee as well as the sender of direct personal correspondence derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with the intended communication. . . . The wife of a prison inmate who is not permitted to read all that her husband wanted to say to her has suffered an abridgment of her interest in communicating with him as plain as that which results from censorship of her letter to him." 416 U. S., at 408–409 (citations omitted).

The Court today abandons *Martinez*'s fundamental premise. In my opinion its suggestion that three later opinions applying reasonableness standards warrant this departure, see *ante*, at 410, n. 9, is disingenuous. Those cases did involve communications between inmates and outsiders; however, as I shall demonstrate, their legal and factual foundations differed critically from those in *Martinez* or in this case.

In *Pell* v. *Procunier*, 417 U. S. 817 (1974), inmates and reporters challenged regulations prohibiting face-to-face media interviews with specific prisoners. *Id.*, at 819. The infringement on prisoners' rights, the Court held, was reasonable because prisoners could write letters to the media—a means of communication less disruptive than the physical entry of reporters into the prison. *Id.*, at 824. The reporters' assertion of a special right of access could not prevail, the Court explained, because the First Amendment does not give the media greater access to public events or institutions—including prisons—than it gives ordinary citizens.[9] *Id.*, at 835. *Pell* in no way diluted the basic distinction articulated in *Martinez*.

Inmates in *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, 433 U. S. 119 (1977), had maintained that First

---

[9] The Court drew support for this proposition from *Branzburg* v. *Hayes*, 408 U. S. 665, 684 (1972). That case, like comparable cases decided after *Pell*, arose outside the prison context. *E. g., Herbert* v. *Lando*, 441 U. S. 153, 165 (1979); *Zurcher* v. *Stanford Daily*, 436 U. S. 547, 565–567 (1978).

Amendment associational rights protected their efforts to form a union. The Court concluded that the administrators' grounds for preventing union organizing within the prison—an activity occurring largely among inmates—were reasonable. *Id.*, at 129. It also approved the officials' refusal to deliver bulk packets of union literature to specific inmates for distribution to others. Applying Equal Protection Clause as well as First Amendment standards, the Court held that the restriction was reasonable because it was limited in scope and because the union retained "other avenues of outside informational flow . . . ." *Id.*, at 131; see *id.*, at 133, 136.

In the third case, *Bell* v. *Wolfish*, 441 U. S. 520 (1979), the Court upheld a regulation that allowed only publishers, bookstores, and book clubs to mail hardbound books to pretrial detainees. Hardbacks might serve as containers for contraband, jail administrators argued. Since the risk of improper use by publishers and similar sources was low, the jail delivered books from them but not from other outsiders. *Id.*, at 549. The Court found this explanation acceptable and held that the rule did not violate the detainees' First Amendment rights. *Id.*, at 550. Although the Court did not expressly address the rights of nonprisoners, the fact that softcover publications were delivered without restriction, see *id.*, at 552, minimized the abridgment of outsiders' rights. The approval in *Wolfish* of greater protection for publishers than for individual citizens reinforces *Martinez*'s view that the First Amendment rights of nonprisoners must be carefully weighed and undermines the Court's approach today.

Most recently, *Turner* v. *Safley*, 482 U. S. 78 (1987), confirmed the vitality of *Martinez* for evaluating encroachments on the First Amendment rights of nonprisoners. The Court relied on the three interim "prisoners' rights" cases to establish a reasonableness standard for reviewing inmate-to-inmate correspondence. *Id.*, at 89. But in its unanimous invalidation of a restriction on inmate marriages, the Court acknowledged that "because the regulation may entail a 'con-

sequential restriction on the [constitutional] rights of those who are not prisoners,'" *Martinez* might posit the correct level of review. 482 U. S., at 97 (quoting *Martinez*, 416 U. S., at 409). It did not "reach this question, however, because even under the reasonable relationship test, the marriage regulation does not withstand scrutiny." [10] 482 U. S., at 97.

The *Turner* opinion cited and quoted from *Martinez* more than 20 times; not once did it disapprove *Martinez*'s holding, its standard, or its recognition of a special interest in protecting the First Amendment rights of those who are *not* prisoners. Notwithstanding, today the Court abandons the premise on which *Martinez* was grounded. This casual discarding of "'the secure foundation'" of considered precedent ill serves the orderly development of the law. See *Runyon* v. *McCrary*, 427 U. S. 160, 190–191 (1976) (STEVENS, J., concurring) (quoting B. Cardozo, The Nature of the Judicial Process 149 (1921)).

## II

In lieu of *Martinez*'s rationale, which properly takes into consideration the effects that prison regulations have on the First Amendment rights of nonprisoners, the Court applies a manipulable "reasonableness" standard to a set of regulations that too easily may be interpreted to authorize arbitrary rejections of literature addressed to inmates. As I pointed out in my partial dissent in *Turner*, an

> "open-ended 'reasonableness' standard makes it much too easy to uphold restrictions on prisoners' First Amendment rights on the basis of administrative concerns and speculation about possible security risks rather than on the basis of evidence that the restrictions

---

[10] Petitioners thus are quite wrong when they contend that *Turner* mandated that First Amendment challenges to prison regulations always be reviewed only for reasonableness. See Brief for Petitioners 18.

are needed to further an important governmental interest." 482 U. S., at 101, n. 1.

To be sure, courts must give prison administrators some berth to combat the "Herculean obstacles" blocking their efforts to maintain security and prevent escapes or other criminal conduct, see *Martinez*, 416 U. S., at 404, and I do not object to those regulations clearly targeted at such interests.[11] Nevertheless, I agree with the Court of Appeals that provisions allowing prison officials to reject a publication if they find its contents are "detrimental" to "security, good order, or discipline" or "might facilitate criminal activity" are impermissibly ambiguous. See *Abbott* v. *Meese*, 263 U. S. App. D. C. 186, 193, 824 F. 2d 1166, 1173 (1987). The term "detrimental" invites so many interpretations that it scarcely checks administrators' actions. Similarly, "might facilitate" —in contrast with "encourage" or "advocate"—so attenuates the causal connection between expression and proscribed conduct that the warden has virtually free rein to censor incoming publications.

Despite this vagueness, the Court accepts petitioners' assertion that they need "broad discretion" to prevent internal disorder, and thus holds that all the regulations are facially valid. See *ante*, at 416. This premature leap of faith creates a presumption that rejections pursuant to these regulations are "reasonable"—a presumption that makes likely far less judicial protection of publishers' rights than I believe the First Amendment requires. As was JUSTICE BLACKMUN in

---

[11] It is undisputed that a warden may exclude an incoming publication if:

"(1) It depicts or describes procedures for the construction or use of weapons, ammunition, bombs or incendiary devices;

"(2) It . . . contains blueprints, drawings or similar descriptions of Bureau of Prisons institutions;

"(3) It depicts or describes procedures for the brewing of alcoholic beverages, or the manufacture of drugs; [or]

"(4) It is written in code. . . ." 28 CFR § 540.71(b) (1988).

*Block* v. *Rutherford,* 468 U. S. 576, 593 (1984) (concurring in judgment), I am concerned that the Court today too readily "substitute[s] the rhetoric of judicial deference for meaningful scrutiny of constitutional claims in the prison setting." Cf. *O'Lone* v. *Estate of Shabazz,* 482 U. S. 342, 358 (1987) (BRENNAN, J., dissenting); *Jones,* 433 U. S., at 142–143 (MARSHALL, J., dissenting).

The feeble protection provided by a "reasonableness" standard applied within the framework of these regulations is apparent in this record.[12]  Like the Labyrinth issue, many of the 46 rejected publications criticized prison conditions or otherwise presented viewpoints that prison administrators likely would not welcome.[13]  Testimony by one mail clerk[14]

---

[12] Cf. *Turner,* 482 U. S., at 100 (STEVENS, J., concurring in part and dissenting in part) ("How a court describes its standard of review when a prison regulation infringes fundamental constitutional rights often has far less consequence for the inmates than the actual showing that the court demands of the State in order to uphold the regulation").

[13] While publications like Labyrinth reported on prison conditions and legal matters, other rejected publications discussed or depicted sexual activity, martial arts, and electronics, and advocated homosexual rights, neo-Nazism, and left-wing politics.  See App. 113–132.  See generally J. L.; Respondents' Lodging.

[14] Asked in a deposition to describe her method for reviewing publications, the clerk replied:

"A. I have a standard.

"Q. What is that if you can explain it?

"A. Okay.  Sex is a standard.  Radical is a standard.  I will go out on a limb and say Communism and fascism is a standard I would use.  It is more of a political-sexual type standard I personally use.  I have not been told.

"Q. You have not been told to use it?

"A. No.

"Q. How did you happen to get it?

"A. By looking at what I see as being excluded, those publications are generally of a sexual political nature.  Therefore, I believe that that is the questionable area and they are the ones that I refer."  App. 97–98.

and the rote explanations for decisions[15] suggest that rejections were based on personal prejudices or categorical assumptions rather than individual assessments of risk. Cf. *Martinez*, 416 U. S., at 415. These circumstances belie the Court's interpretation of these regulations as "content-neutral" and its assertion that rejection decisions are made individually. See *ante*, at 414–417. Some of the rejected publications may represent the sole medium for conveying and receiving a particular unconventional message; thus it is irrelevant that the regulations permit many other publications to be delivered to prisoners. See *ante*, at 417–418. No evidence supports the Court's assumption that, unlike personal letters, these publications will circulate within the prison and cause ripples of disruption.[16] See *ante*, at 412, 418. Nor is there any evidence that an incoming publication ever caused a disciplinary or security problem; indeed, some of the rejected publications were delivered to inmates in other prisons without incident. See App. 60, 99, 116–117. In sum, the record convinces me that under either the *Martinez* standard or the more deferential "reasonableness" standard these

---

[15] Statements of reasons for returning different publications were identical even in their misspelling. See J. L. 5, 46, 47, 48 ("[T]his publication is used in part to glorify problem inmates and prison unions which could cause problems to inmates and staff in the security and orderly running of this institution. This publication also propagets [*sic*] an adversary attitude by inmates toward staff"); cf. *id.*, at 40 ("[T]his type of material on institutions has a tendency to develop an adversary attitude by inmates toward staff, which can cause an unhealthy environment in this institution").

[16] The Court makes this assumption on the basis of a statement by petitioners at oral argument. See *ante*, at 413 (quoting Tr. of Oral Arg. 10). But each publication at issue was addressed to a single inmate, making this case more analogous to the personal correspondence in *Martinez* than to the bulk mailings in *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, 433 U. S. 119 (1977). The prison regulations in *Martinez* raised the specter of disruptive dissemination as a justification for censorship, 416 U. S., at 399, n. 3; the Court nevertheless found those regulations unconstitutional.

regulations are an impermissibly exaggerated response to security concerns. Cf. *Turner*, 482 U. S., at 89–90.

## III

If a prison official deems part of a publication's content—even just one page of a book—to present an intolerable security risk, the Bureau's regulations authorize the official to return the entire issue to the publisher. See 28 CFR § 540.71(e) (1988). In their challenge to this all-or-nothing rule, respondents argue that First Amendment interests easily could be accommodated if administrators omitted the objectionable material and forwarded the rest of the publication to the inmate. The District Court, however, found that "defendants' fears" that "such censorship would create more discontent than the current practice" were "reasonably founded." App. to Pet. for Cert. 34a. To the contrary, the Court of Appeals applied the *Martinez* standard and held that "rejection of the balance is not 'generally necessary' to protect the legitimate governmental interest involved in the portion properly rejected." 263 U. S. App. D. C., at 193–194, 824 F. 2d, at 1173–1174.

In this Court petitioners argue that on remand the Court of Appeals should conduct "a detailed analysis of the evidence in this case" to determine if the all-or-nothing rule is "reasonable." Brief for Petitioners 31. "The validity of that policy," they continue, "will depend, among other things, on the security and administrative justifications for that policy, the availability of alternative courses of action, and the costs and risks associated with employing those alternatives." *Ibid.* It is remarkable that after 16 years of litigation petitioners have failed to develop an argument that tells us anything about the assumed security or administrative justification for this rule. Even more remarkable is the Court's conclusion that since it does not apply the *Martinez* standard, it need not examine the appropriateness of the District Court's find-

ing that the rule was reasonable. See *ante*, at 419. A review of the record reveals that the Court thus defers to "findings" of a security threat that even prison officials admitted to be nonexistent.

There is no evidence that delivery of only part of a publication would endanger prison security.[17] Rather, the primary

---

[17] I quote, in its entirety, the discussion of the record that preceded the District Court's finding that the all-or-nothing rule was reasonable:

"The plaintiffs offered evidence that a less restrictive policy, at no cost to security, would be to tear out the rejected portions and admit the rest of the publication. But the defendants contend that such censorship would create more discontent than the current practice, and one of the plaintiffs' witnesses agreed.'" App. to Pet. for Cert. 34a.

The District Court's footnote cites to the following trial testimony by a witness whom respondents offered as an expert in the field of corrections:

"Q Are you familiar with the policy of the Bureau of Prisons concerning what we call the all-or-nothing rule?

"A As I understand it, if a publication is approved for admission, it may be approved in toto. If it has material in it which is considered offensive[,] it will be entirely excluded regardless of the condition or the tenor of the other items in the publication.

"Q And is there a security justification, in your opinion, for not giving the prisoner the—

"A I can sympathize with the Bureau about any publication which does have material which I would like to exclude. Take, for example, a publication that gave an explicit design of how to produce a Molotov cocktail. I would not like to admit that particular publication into the institution. However, I don't like the idea of just cutting out the offending part of that publication and letting that in. I think that's the compromise which one might make. I don't like it, but I suppose that's the best of the bad solutions which are available.

"Q Do you see any security risk in cutting out the offending portion and giving the unoffending portion to the inmate?

"A If pushed to the wall, I guess I would do that, but as I said earlier in my deposition and as I say now, I don't like that. It smacks of what goes on in fascist countries and is not a very attractive solution to me, but I don't see any way out of it.

"I'd rather do that than exclude the publication entirely just on the basis of one offending passage." Tr. 392–393.

Although this testimony manifests the *expert witness'* discontent with censoring parts of publications, it offers no support for petitioners' ar-

justification advanced for the all-or-nothing rule was administrative convenience. See App. 41, 68. The Bureau has objected that a contrary rule "would mean defacing the material and laboriously going over each article in each publication. . . ." 44 Fed. Reg. 38258 (1979). But general speculation that some administrative burden might ensue should not be sufficient to justify a meat-ax abridgment of the First Amendment rights of either a free citizen or a prison inmate. It is difficult even to imagine such a burden in this instance: if, as the regulations' text seems to require, prison officials actually read an article before rejecting it, the incremental burden associated with clipping out the offending matter could not be of constitutional significance. The Bureau's administrative convenience justification thus is insufficient as a matter of law under either the *Martinez* standard or a "reasonableness" standard. The District Court's contradictory finding simply highlights the likelihood that an attitude of broad judicial deference, coupled with a "reasonableness"

---

gument that *inmate* discontent with the practice would threaten prison security. Indeed petitioners themselves proffered few pieces of supporting evidence, among them this deposition testimony by an official at the Marion Federal Penitentiary:

"Q. It wouldn't present a security threat, would it, to cut out the page?

"A. No, it would not prevent *[sic]* a security threat to cut out the page if there was nothing else in there.

. . . . .

"Q. And is it then just a question of administrative convenience to the institution? It is easier not to bother with cutting out different pieces, is that right?

"A. Well, I think in dealing with the kind of individual that we deal with here or in any institution, if you start cutting up the magazines, you are going to leave yourself open to all kinds of criticism, remarks and other problems. So it is best to just return the entire publication to the source and then no other insinuations or remarks can be made concerning us and what we do to individual publications or any magazines that people receive." App. 100–101.

See also *id.*, at 41, 68.

standard, will provide inadequate protection for the rights at stake.[18]

For these reasons, I would affirm the judgment of the Court of Appeals.

---

[18] Thus I must disagree with petitioners' staunch insistence that the reasonableness standard is not "toothless." See Brief for Petitioners 27. As I suggested in *Turner:*

"[I]f the standard can be satisfied by nothing more than a *'logical* connection' between the regulation and any legitimate penological concern perceived by a cautious warden, it is virtually meaningless. Application of the standard would seem to permit disregard for inmates' constitutional rights whenever the imagination of the warden produces a plausible security concern and a deferential trial court is able to discern a logical connection between that concern and the challenged regulation. Indeed, there is a logical connection between prison discipline and the use of bullwhips on prisoners; and security is logically furthered by a total ban on inmate communication, not only with other inmates but also with outsiders who conceivably might be interested in arranging an attack within the prison or an escape from it." 482 U. S., at 100–101 (concurring in part and dissenting in part) (citation omitted) (emphasis in original).