**Nancy HETZEL, administratrix of the estate of Roy Hetzel, Plaintiff,**

v.

**Jim SWARTZ, Defendant.**

**Civil Action No. 3:CV–95–0437.**

United States District Court, M.D. Pennsylvania.

Dec. 29, 1998.

**446**

Matthew Cartwright, Scranton, PA, for Plaintiff.

Janine Torda, Scranton, PA, for Defendant.

### MEMORANDUM AND ORDER

CONABOY, District Judge.

### I

### BACKGROUND

In July of 1994, both Roy Hetzel and Nancy Hetzel were arrested on charges relating to possession of drugs, and as a result were incarcerated in the Luzerne County Prison.[1] While incarcerated, blood testing on Nancy Hetzel showed she was positive for the HIV virus (Human Immunodeficiency Virus). Shortly thereafter, following a blood test, Roy Hetzel learned that he was not only HIV positive, but also that he was suffering from "full blown AIDS" (acquired immune deficiency syndrome).

Nancy Hetzel was released from the Luzerne County Prison in February of 1995. Roy Hetzel was subsequently released for humanitarian causes in November of 1995. In April of 1996, Roy and Nancy Hetzel were married. Roy Hetzel died on May 30, 1996, and Nancy Hetzel was substituted as party Plaintiff, after being designated as administratrix of his estate. Counsel was subsequently appointed to represent the Plaintiff in prosecuting this case.

On March 21, 1995, Decedent filed a pro se "civil rights" complaint under 42 U.S.C. § 1983 against Community Counseling Services of Northeastern Pennsylvania (hereinafter "CCS") and Jim Swartz, an employee of CCS and counselor at the Luzerne County Prison. He alleged he was denied appropriate psychological care or counseling as required by the Eighth Amendment to the United States Constitution, and also raised a claim based on alleged violation of privacy rights under the Pennsylvania Confidentiality of HIV Related Information Act (hereinafter "The Act"). 35 Pa. P.S. §§ 7601–7612.

As a matter of case history, CCS was dismissed as a Defendant by Order of this Court dated December 18, 1995. (Doc. 29). The case continued against Defendant Swartz and on December 22, 1997, summary judgment requested by that Defendant was denied and the case was ordered to proceed to trial on two issues:

(1) Whether or not Plaintiff was denied psychological care or counseling in violation of the Eighth Amendment;

(2) Whether or not Defendant disclosed confidential information in violation of the

---

1. They were not married at the time, but had "been together" for a number of years.

Pennsylvania Confidentiality of HIV Related Information Act, 35 Pa. P.S. §§ 7601–7612 (The Act).

(Doc. 51).

Since a jury trial was not demanded, the case proceeded to a trial before this Court without a jury on October 5, 1998.

The following represents the legal authority governing consideration of this case, a review of the testimony presented and positions of the parties, and the Court's findings and conclusions. For the reasons stated, the Court will enter a Verdict for the Defendant.

## II

## *LEGAL AUTHORITY*

### A

■ Filing a complaint does not assure a verdict, indeed, to be successful, the Plaintiff must prove her claim by testimony and evidence that, in the court's mind, outweighs the evidence opposed to it. In order to prevail in a lawsuit the Plaintiff must prove all of the elements of her claim against the Defendant by the fair weight and preponderance of the evidence. *See Burch v. Reading*, 240 F.2d 574, 578 (3d Cir.Pa.1957), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957). In a non-jury trial, the trial judge must make all decisions on the credibility and weight of the evidence and testimony, as well as on all legal issues.

### B

### *EXPERT TESTIMONY*

■ A witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise. Fed.R.Evid. 702. The trial court is not bound by such opinions however, and a final decision must be based on the weight of all of the evidence in the trial.

### C

### *INCARCERATION*

■ The fact of incarceration alone does not deprive an individual of all constitutional protections. *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Inmates retain, among other things, the right of access to the courts to redress wrongs. Lawful incarceration, however, does bring about the withdrawal or diminishment of many privileges and rights because of the necessities of maintaining peace and security. *Price v. Johnston*, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948) *see also Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). For this reason, a "prison inmate retains those ... [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrective system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). As such, a prisoner's constitutional "rights must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Thornburgh v. Abbott*, 490 U.S. 401, 407, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)(*quoting, Turner*, 482 U.S. at 85, 107 S.Ct. 2254).

### D

### CIVIL RIGHTS CLAIM

■ In order to state a viable § 1983 claim, a plaintiff must allege that the conduct complained of was committed by a person acting under color of state law and that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or by laws of the United States. *E.g., Cohen v. City of Philadelphia*, 736 F.2d 81, 83 (3d Cir.), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984). A defendant's conduct must have a close causal connection to plaintiff's injury in order for § 1983 liability to attach. *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). A prerequisite for a viable civil rights claims is that a defendant directed, or knew of and acquiesced in, the deprivation of a plaintiff's constitutional rights. *E.g., Monell v. Department of Social Serv. of the City of N.Y.*, 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Gay v. Petsock*, 917 F.2d 768, 771 (3d Cir.1990); *Capone v. Marinelli*, 868 F.2d 102, 106 n. 7

(3d Cir.1989); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207–08 (3d Cir.1988).

## E

*EIGHTH AMENDMENT (Medical Cause)*

■ Like other conditions of confinement, medical care provided to inmates is subject to scrutiny under the Eighth Amendment's prohibition against cruel and unusual punishment. *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The relevant inquiry in the context of medical care is two-pronged: "it requires deliberate indifference to a prisoners serious illness or injury." *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

■ In determining "deliberate indifference" with regard to an Eighth Amendment claim, the Supreme Court has established that the proper inquiry is whether a prison official "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This, among other ways, is demonstrated "[w]hen ... prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or to deny access to a physician capable of evaluating the need for such treatment." *Monmouth County Correctional Institutional Inmates v. Lanzaro;* 834 F.2d 326 (3d Cir.1987)(*citing Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979)).

■ A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Monmouth County Correctional Institutional Inmates*, 834 F.2d at 347. The serious medical need element contemplates a condition of urgency, in that if delayed or denied it may produce death, degeneration, or extreme pain. *Id.*

While this standard is most commonly applied in challenges to alleged deficiencies in prison medical treatment for physical problems, our Court of Appeals has recognized that the deliberate indifference standard is also applicable in evaluating the constitutional adequacy of psychological or psychiatric care in prisons. *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754 (3d Cir.1979). In reaching this conclusion, the Third Circuit has embraced the reasoning set forth in *Bowring v. Godwin*, that there is "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart." *Inmates of Allegheny Cty. Jail*, 612 F.2d at 763 (*citing Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir.1977)). Similar to physical care, however, "courts generally refrain from second-guessing the propriety or adequacy of a particular type of psychological or psychiatric treatment and from recognizing claims of negligence, mistake or difference of opinion." *Carrigan v. State of Del.*, 957 F.Supp. 1376, 1384 (D.Del.1997)(*citing Bowring*, 551 F.2d at 48).

■ In evaluating the constitutional adequacy of a psychological or psychiatric *system* of care in a jail or prison, one must determine "whether inmates with a serious mental or emotional illness or disturbance are provided reasonable access to medical personnel qualified to diagnose and treat such illnesses or disturbances." *Inmates of Allegheny County Jail*, 612 F.2d at 763. "If it is determined that inmates with serious mental ills are effectively prevented from being diagnosed and treated by qualified professionals, [then] the system of care does not meet the constitutional requirements set forth by *Estell v. Gamble*, and thus violates the Due Process Clause." *Id.*

When the focus is narrowed to a particular *inmate* seeking psychological diagnosis or treatment within the prison system, the Court in *Bowring v. Godwin* has held that an inmate is

entitled to psychological or psychiatric treatment if a physician or health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or denial of care would be substantial.

551 F.2d at 47. Furthermore, the Court stated that this "right to treatment is limited

to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Id.* at 48. As previously stated, however, even if the inmate shows that he was denied psychological or psychiatric treatment, he must also demonstrate that the failure or refusal to provide treatment constituted deliberate indifference on behalf of the medical personnel.

## F

### MEDICAL CONFIDENTIALITY

The Pennsylvania Confidentiality of HIV–Related Information Act, 35 Pa. P.S. §§ 7601–7612 (The Act), provides, among other things, for certain limitations on disclosure of information by those who provide help or psychological care to persons with the HIV related virus.[2]

Based on our review of the Act, we find that § 7606 entitled "Confidentiality of Records", is the appropriate section to be applied to the facts of this case. That section provides in relevant part:

(a) **Limitations on disclosure.**-No person or employee, or agent of such person, who obtains confidential HIV-related information in the course of providing any health or social service or pursuant to a release of confidential HIV-related information under subsection (c)[3] may disclose or be compelled to disclose the information, except to the following persons:

**2.** On January 10, 1995, the Decedent and the Defendant signed a "CONSENT TO OBTAIN/RELEASE INFORMATION." (Plaintiff's Exhibit "6"). We find, among other things, that there was no proof of any violation of the said agreement.

**3.** Section (c), entitled "Required elements of written consent to disclose" provides that:
A written consent to disclosure of confidential HIV-related information shall include:
(1) The specific name or general designation of the person permitted to make the disclosure.
(2) The name or title of the individual, or name of the organization to which the disclosure is to be made.
(3) The name of the subject.
(4) The purpose of the disclosure.
(5) How much and what kind of information is to be disclosed.

(1) The subject.

(3) Any person specifically designated in a written consent as provided for in subsection (c).

(4) An agent, employee or medical staff member of a health care provider[4], when the health care provider has received confidential HIV-related information during the course of the subjects' diagnosis or treatment by the health care provider, provided that the agent, employee or medical staff member is involved in the medical care or treatment of the subject. Nothing in this paragraph shall be construed to require the segregation of confidential HIV-related information from a subject's medical record.

(6) Individual health care providers[5] involved in the care of the subject with an HIV-related condition or a positive test, when knowledge of the condition or test result is necessary to provide emergency care or treatment appropriate to the individual; or health care providers consulted to determine diagnosis and treatment of the individual.

## III

### TESTIMONY

#### A

##### Plaintiff's Witnesses

##### Nancy Hetzel

Nancy Hetzel, the present Plaintiff, was the first of three witnesses on behalf of the

(6) The signature of the subject.

(7) The date on which the consent is signed.

(8) A statement that the consent is subject to revocation at any time except to the extent that the person who is to make the disclosure has already acted in reliance on it.

(9) The date, event or condition upon which the consent will expire, if not earlier revoked.

**4.** "Health care provider" is defined by the ACT as "an individual or institutional health care provider. 35 Pa. P.S. § 7603.

**5.** "Individual health care provider" is defined by the ACT as a "physician, nurse ... psychologist ... providing medical, nursing, drug or alcohol rehabilitation services, mental health services, other health care services or an employee or agent of such or an institutional health care provider." 35 Pa. P.S. § 7603.

Plaintiff. She testified that she is 33 years old and since her release from the Luzerne County Prison, has been living in New Jersey with her mother. She testified that in July of 1994, she, along with the Decedent, was in the Luzerne County Prison on related drug charges. She stated that during that time she underwent a physical examination because of swelling complaints which revealed that she was HIV positive. She stated that Roy Hetzel was subsequently tested and it was determined that he had "full blown AIDS".

She graphically described the situation in the Luzerne County Prison, and explained that although she was separated from her husband's position of incarceration, they tried to work out various means of communicating. Among those was a system in which she would write letters to her mother who would, in turn, forward them to Roy Hetzel. She also testified that she was able to look up several stories from the yard where she would be allowed to exercise, and, at times, could communicate with her husband in a window at the higher level. Through these various means they were able to communicate that they were each aware of the other's condition. In addition, she also testified that through these means she learned that her husband was quite depressed because of his condition.

She was subsequently released in February of 1995, and while she was unable to travel to Luzerne County very often, she did keep in touch by telephone and made several trips to Luzerne County to visit her husband and to talk to others concerning her husband's condition. She testified that Roy Hetzel told her that he was constantly "putting in" to see the "psyke doctor", but that no one would talk to him. She stated that she could only remember one joint session both she and her husband had with a counselor while incarcerated at Luzerne County Prison.

She testified that she continued to make contact with her husband and visited him as often as possible. During this time, she stated that he was very upset and continued to tell her that he could not get anywhere with the officials at the Luzerne County Prison as far as any treatment was concerned. She

testified that when she, in turn, inquired, she was told only that "Jim would see him".

She testified there is a form inmates fill out when they wish to request a visit with a counselor. She stated her husband told her he filled those out repeatedly, but he was not getting any response or certainly not the response that he felt he was entitled to.

She testified she ultimately was able to contact a Luzerne County Judge and that eventually her husband was released on what she described as a "hardship release" in March of 1995. She stated further that on May 30, 1995, while she was at his side, Roy Hetzel died in a hospice.

On cross examination she indicated she was aware of Roy Hetzel's desire to get his medical records apart from any treatment he may have been seeking. She stated he felt he was not being told all about his health, and that he wanted his records not because of a lawsuit he was involved in, but because he desired to know the full details about his health.

She indicated she was only aware of the Decedent, having one session with Defendant Swartz, even though the records clearly show a number of visits.

### Brian Lambert

The second witness on behalf of the Plaintiff was Brian Lambert. Mr. Lambert testified he is a resident of Kingston, Pennsylvania, is 25 years of age, and had been in the Luzerne County Prison on several occasions. He stated that in 1992, after having been convicted on burglary and "related charges", he spent a considerable period of time in the Luzerne County Prison where he first met and was befriended by Roy Hetzel. He testified further that when he was remanded to prison on a later date in 1994, he also made contact with and remained very friendly with Roy Hetzel. As such, he indicated he was able to observe both Decedent's actions and his condition while incarcerated at Luzerne County Prison. He also testified that while he was out on parole, he visited Roy Hetzel in the Luzerne County Prison during the months between October of 1994 and June of 1995. He stated that during this period he noticed the Decedent was constantly de-

pressed and was in very poor physical condition. He testified Roy Hetzel was concerned that a number of the guards and some other people in the prison were aware of his condition and that they shunned him and treated him badly as a result. He stated he felt Roy Hetzel was concerned that someone had improperly made his condition known to several of the guards although he could not specifically identify or name any guards at the prison who, in his opinion, were in possession of information about Roy Hetzel's condition. He indicated that Roy Hetzel continually put in requests to see the mental health counselor, but to the best of his knowledge, the counselor was only able to see the Defendant on one or two occasions. He also stated he helped Roy Hetzel fill out many requests and that he, in turn, sent a note to the Warden of the prison complaining about the Defendant's failure to see Roy Hetzel.

Furthermore, he testified that during this period of time Roy Hetzel's physical condition continued to deteriorate to the point where it was extremely difficult for him to walk and that he (Lambert) often helped him to the best of his ability.

Brian Lambert also explained that there were two types of counselors at the prison; counselors designated to give help with things like family contacts and phone calls and a counselor designated to provide psychological or mental help.

### Michael Dallaire

The third witness was Michael Dallaire. Mr. Dallaire testified he was from Forestdale, Massachusetts, and that he presently runs a consulting company which gives advice on correctional health care. He testified he is a registered nurse and had worked in various types of prisons and other institutions in the State of Massachusetts. His main area of involvement was with the medical support in hospitals for the criminally insane. He stated he belonged to several groups active in setting up and trying to establish appropriate guidelines for health care in prisons, and that he was familiar with medical protocols for treating AIDS patients.

On cross examination about his credentials, he stated he did not have a bachelor's degree, but did have an associate's degree;

that he had some involvement in writing of the protocols for AIDS; but had not yet been certified by the various groups who certify people as being fully accredited in such areas. He testified he has done at least entry level counseling on many problems, including AIDS; and, that he was aware of the appropriateness of sending such patients to proper persons for treatment or counseling. He testified he has been involved with AIDS patients "numerous times" and explained his knowledge of and the need for treatment with drugs and medical intervention, as well as counseling and mental intervention in such cases. He also indicated that in his opinion counseling is very necessary at the beginning of this disease to monitor the patient and also for the safety of the institution and other inmates.

He stated there are a number of standards which have been adopted by various National groups and all of those call for seeing such patients often and that regular counseling should be part of that care. He indicated that "sick slips" used to request such services should be part of the record and maintained in the inmate's or patient's file. He identified several exhibits taken from Hetzel's records at the Luzerne County Prison, including his medical record (with the staff physician's report), as well as some other reports signed by Defendant Swartz.

He testified that the records he reviewed, revealed, in his opinion, that the Decedent made approximately five visits to the Defendant Swartz on January 4, January 10, January 11, January 18 and March 31, 1995. He opined however, the records for January 11 and March 31, seemed only to indicate that a note was made in the record, and that no actual visits were made on those dates.

When asked his opinion about the treatment Roy Hetzel was given, or not given, he opined that Defendant Swartz was at least negligent in not providing additional counseling sessions to the Decedent, Roy Hetzel, and that his actions in not seeing Roy Hetzel constituted deliberate indifference to a serious illness of the Decedent, Roy Hetzel, and to the "rights of the inmate".

On cross examination, he testified that a counselor cannot force someone into counseling and determining the need for psychiatric care is not always easy, and indeed, difficult in some cases. He opined, however, that even in cases where patients state or indicate they do not wish to be seen or to be counseled, the proper procedure would be to require such visits in cases of people who are suffering from AIDS.

Finally, he testified that he was unaware of any mandate for county prisons in the Commonwealth of Pennsylvania to adopt specific protocols, or of any protocol on treatment of AIDS· or other types of counseling services that had been adopted by the Luzerne County Prison.

## B

### DEFENSE WITNESSES

#### James Swartz

James Swartz, the Defendant, testified he is married and lives in Mountaintop, Pennsylvania, with his three children. He testified he has a bachelor's degree from Penn State University and a Masters degree in Social Work from Marywood University, Scranton, Pennsylvania. He also indicated that he has been an employee of CCS for some time and presently has been working at Luzerne County Prison since 1992. He stated he also worked at the prison for a period of time from 1974 to 1984, when he left for other employment. He indicated the contract that CCS has with the Luzerne County Prison is for the provision of general mental health services. He stated he is an employee of and receives his compensation from CCS.

He testified, that his duties under the contract included the provision of services to the chronically mentally ill and the chronically mentally retarded inmates at the Luzerne County Prison. He testified he provides service to many inmates who had mental health problems prior to arriving at the prison, as well as others who are directed to him by either the medical staff or other counselors at the Luzerne County Prison. He indicated there is a large percentage of the population at Luzerne County Prison suffering from mental illness and that unless there is a

rather severe mental illness present, most cases are handled by the correctional counselors because there are approximately five people in those positions whereas he is (and was at the time of the events in this case) the only person presently serving as a mental health counselor.

He testified that at the time of the events pertinent to this case, he had in excess of 100 patients who are inmates at the prison and who he saw on a fairly regular basis. He stated most of them were chronically mentally ill or chronically mentally retarded and many had long and serious prior connections with other agencies. He indicated the process in the Luzerne County Prison was that the correctional counselors normally decided who was eligible for mental health counseling and they, in turn, refer those patients to him. He stated that no counselor had ever referred Decedent Hetzel to him for mental health counseling. In addition, he stated, because of the large number involved, that there was usually a waiting list for mental health services at the prison.

He testified that in November of 1994 there was another mental health counselor at the prison who had initially seen the Roy Hetzel. He stated when that counselor left in December of 1994 he "picked up" Roy Hetzel as a patient and at that time first looked at and became familiar with his file. By reference to his file and file notes, he testified he first saw Roy Hetzel on January 4, 1995, after having received "multiple requests". He testified that Roy Hetzel was angry and frustrated, particularly about the lack of medical and administrative treatment at the Luzerne County Prison, and that the Decedent was not specifically asking for mental health services at that time. He testified his notes indicated he saw no specific mental health problems with Roy Hetzel, but that he sought a psychiatric examination for the Decedent to get a complete evaluation and proper information and guidance.

He testified that on January 5, 1995, he was present when Decedent, Roy Hetzel, met for an examination with the prison psychiatrist. He indicated that the meeting lasted approximately one hour. After reviewing the

psychiatrist's notes regarding the meeting[6], he pointed out that there was no mental health diagnosis, that there was no medication prescribed and that the psychiatrist did not direct counseling, except on an "as needed" basis.

He testified there were two sessions with the Decedent after this, on January 10, 1996 and January 18, 1996. He stated that on January 10, 1996 the Decedent again wanted to discuss his medical records and his desire to get those records. He also noted that at no time during the session did Roy Hetzel mention or refer to any mental health problem. He further testified that it was on that date that the Decedent signed a consent form which would allow the Defendant to procure the Decedent's medical records. He stated that his notes showed there was a concern that Decedent Hetzel may have had more of an intention to manipulate the system or file a lawsuit against the institution than any concern or need for counseling.

He testified he also had a meeting with the Decedent on January 18, 1995. He stated on that date Roy Hetzel was very angry with the medical services at the institution and that he, the Decedent, denied any need for mental health services. Mr. Swartz stated that there was nothing evident in his consultation or examination of the Decedent which showed the need for counseling or mental health services. He further testified that was the last time he saw the Decedent.

He stated that on March 31, 1995, based on the discussions he had with the Decedent; the reaction of the Decedent regarding procuring his medical records; and the Decedent's denial of the need for mental health services, he closed his file. He further indicated he would not have closed the file if he received any notes or indication from other counselors indicating the need for services to the Decedent. But he felt, on the basis of his interviews and Decedent's file, there was no further desire or need for mental health services at that point.

He testified that neither he nor CCS maintain requests he received for services in patient files, but rather he destroyed them after a relatively short period of time.

He stated the Decedent did tell him he was suffering from AIDS; that he did not deny him any services on that basis; and that he had no problem dealing with people who were suffering from AIDS. He testified he did not tell any of the members of the guard staff or any other employees at the Luzerne County Institution that Decedent was suffering from AIDS, with the exception of Dr. Hartman and the supervising nurse of the infirmary.

Finally, on direct examination, he testified he stopped seeing the Decedent generally because (1) Decedent was not suffering from any chronic mental illness; (2) that the Decedent was not mentally challenged; (3) that the Decedent denied wanting or needing any further counseling or mental services; (4) that there was no mandate to continue to provide services to HIV or AIDS patients.

On cross examination he testified he was not familiar with the Pennsylvania Privacy Act or the present requirements or purposes of that Act. He stated the only time he had a discussion of the Decedent's condition was when he received the records from the infirmary.

In testifying, he relied heavily on his notes because he said he had little recollection of the Decedent or the services rendered to him beyond what was contained in the notes of the Decedent's file. He acknowledged there are often sound purposes for counseling those who are seriously ill and especially those who feel or have been told they are dying, so that they can contact their families, deal with family problems, and come to grips with the reality of dying. He also testified that even though a client may be evasive and angry or in denial, oftentimes such a patient needs counseling. He testified further that

---

**6.** Plaintiff's exhibit 2 shows the following to be the full text of the Physician's notes following Decedent's examination on January 5, 1995:

"47 y.o. white male seen at LCCF. Struggling [with] coping [with] illness, yet reports he's sleeping fairly well. Discussed options re: no-

tifying his adult children, [with] whom he's been estranged, re: his illness. He's reluctant to do so. Will be [followed by] M.H. staff prn (as needed). No need for medication at this time."

he made the decision to close the file for the reasons previously stated and that he had the authority to do so. He testified that after March 31, 1995, he did not recall seeing any request for services. He did state however, that he could not say for sure there were no such services requested, but insisted if he had received a request from the Decedent or from other counselors he would have seen him. He repeated that on the visits where he did see the Decedent, the Decedent was angry and frustrated, mainly because of the problems he experienced with getting his medical records for the purpose of continuing a case against the institution.

On re-direct examination, he testified he does not feel CCS or the Luzerne County Prison have any protocols for counseling AIDS patients, only for providing medical and mental health services generally. He repeated that when the Decedent did visit him, he [Decedent] denied he was having trouble coping with his illness, but he continued to be angry at the lack of medical care and treatment provided by the Luzerne County Prison, and the difficulty he was experiencing in getting his medical records.

### O. William Kelsy

O. William Kelsy testified as an expert on behalf of the Defendant. He stated he is from Mechanicsburg, Pennsylvania, and a retired health care administrator. He is neither a nurse nor a psychologist. He testified he is now a consultant to the health care industry and appears frequently as an expert witness. He indicated that he began studies in biology at the University of Pennsylvania and finally received his degree in management from Shippensburg College. He stated he had been a health care administrator for the Pennsylvania Department of Corrections for a considerable period of time, and developed or helped develop many programs and standards for the delivery of health care to people in state and local prisons. He referred specifically to the development of policy OPM105.101, which he said is still in effect in Pennsylvania State Institutions for the care and handling of AIDS patients. He testified there are indeed state protocols for the care and treatment of AIDS patients, but there is no requirement for adoption of these by county institutions and he had no information on whether or not the Luzerne County Prison subscribes to these various protocols.

After reviewing the records of the Luzerne County Prison, and particularly Defendant Swartz's records concerning treatment and care of the Decedent, he opined that the Defendant is a professional health counselor, rather than a corrections counselor, and that Defendant's conduct was appropriate because there was no mental health problem brought to his attention by either the medical director at the institution or the Decedent. He testified further that if the Decedent had been recommended for mental health care there would have been a plan designed by the medical doctor, but here, the doctor did not recommend such treatment or make such a diagnosis and thus, Defendant Swartz was not directed or obligated to develop his own plan of mental health counseling, particularly when the Decedent indicated he did not need or was not interested in such counseling.

### IV

### DISCUSSION

### A

### ARGUMENTS AND POSITIONS OF THE PARTIES

### Plaintiff's Position

The Plaintiff argues that Defendant Swartz's decision or failure to honor Roy Hetzel's repeated requests for psychological counseling between November 25, 1994 and October, 1995, despite Mr. Hetzel being in a group of inmates needing counseling attention; despite the institution's doctor's recommendation to provide counseling attention to Roy Hetzel "on an as needed basis"; and despite the "common knowledge" that AIDS treatment protocol calls for close counseling attention to such patients; constituted "deliberate indifference to a prisoner's serious illness" in violation of Decedent's rights guaranteed him by the Eighth Amendment to the United States Constitution.

In addition, Plaintiff argues that Defendant Swartz's revealing Roy Hetzel's AIDS condition to at least one non-physician em-

ployee of the Luzerne County Prison, constituted a violation of the Pennsylvania Confidentiality of HIV–Related Information Act. 35 Pa. P.S. § 7601–7612.

Further, Plaintiff claims that this conduct resulted in severe psychological and mental health damage to the Decedent, for which his estate is entitled to compensation.

### Defendant's Position

The Defendant argues, on the other hand, that he provided appropriate psychological care and counseling to Decedent Roy Hetzel at all times and under all circumstances present at the Luzerne County Prison in 1994 and 1995 as required by the Eighth Amendment.

The Defendant argues that while Plaintiff may well have been suffering from a serious illness, the evidence in this case fails to establish a deliberate indifference to Decedent Roy Hetzel's illness and that the propriety or adequacy of a particular course of treatment, along with other aspects of health care, cannot be second guessed by the court and remains a question of sound professional judgment. In addition, the Defendant argues that his actions and conduct toward the Decedent Roy Hetzel were reasonable and appropriate under the circumstances and that the Plaintiff has failed to prove a deliberate indifference to the Decedent's illness.

The Defendant further argues that he did not violate the mandates of the Confidentiality of HIV–Related Information Act, in that the Decedent's illness was disclosed only to individual health care providers involved in the medical care and treatment of said Decedent while he was at the Luzerne County Correctional facility.

### B

### FINDINGS AND CONCLUSIONS

As is often the case, the legal authorities and legal arguments made on behalf of the Plaintiff and Defendant are much clearer and easier to decipher than the actual testimony and facts of the case.

There is little doubt that the Decedent Roy Hetzel suffered from a serious illness as defined in cases based on failure to provide adequate medical care in a prison setting. But, once we move beyond that fact, there is little the parties agree upon.

Plaintiff would have us believe the Decedent cried out continually for needed psychological counseling—but Defendant argues the Decedent denied needing such counseling and that the medical doctor who examined Decedent found no mental illness and prescribed no specific course of treatment. Defendant argues, therefore, there was no deliberate indifference to the Decedent's condition. To the contrary, Defendant claims the services provided the Decedent were based on sound professional judgment under all of the surrounding circumstances.

In addition to conflicting lay testimony, the court heard conflicting expert testimony, with the Plaintiff's expert witness opining that the Defendant was deliberately indifferent to Decedent's condition—and Defendant's expert opining that the Defendant used proper professional judgment and did not violate the Decedent's right to treatment under the circumstances.

The Court finds the Defendant's evidence and testimony more credible and believable and worthy of more weight than the testimony and evidence of the Plaintiff.

To begin with, we find the Plaintiff makes no showing that the Defendant failed to respond properly and produces no evidence or testimony of any antipathy towards AIDS patients. Rather, the credible testimony shows the Decedent angry from the first visit with the Defendant over records and determined to pursue legal action to recover compensation from the institution—and asserting that he did not need mental health counseling. When confronted with this reality, after the first few visits, we find the testimony shows it was quite reasonable for the Defendant to turn his attention to the many other inmates who did, in fact, need and want psychological counseling. Indeed, we find that the Decedent can hardly be believed to have sought care from the Defendant when he asked, in his complaint filed on March 21, 1995, to be seen by someone other than the

Defendant. His complaint also reveals more interest in compensation than treatment.[7]

Nancy Hetzel's testimony (about Decedent's requests for visits to a counselor) is based largely on what others, supposedly, told her, since she was released from the prison in February of 1996 and was able to visit the Decedent at the institution only a few times before the Decedent was released. Plaintiff's witness, Lambert, was obviously interested in helping a person who befriended him in prison, and claimed to have assisted the Decedent make out a number of requests for visits over a period of time. But, even if we were to credit this testimony fully, it only supports the concept of a number of requests for counselor visits, and offers no reason why the Decedent was not seen on each request.

On the other hand, the records from the prison—particularly the doctor's notes, (see supra n. 6), show no diagnosis of any mental health problem—and no prescribed pattern of treatment—except to be seen "as needed". This is added to the Defendant's testimony, that he did in fact see many patients repeatedly; that he had no animosity toward the Decedent; that Decedent denied any need for mental health treatment; that there were adequate counselors to provide other help; and that he made a professional judgment to close the Decedent's file based on his own experience, the Decedent's conduct and statements, and the psychiatrist's report after examining the Decedent. Such comparison leads the Court to conclude that the Plaintiff has failed to prove the Defendant acted improperly towards the decedent, under all of the circumstances of this case.

Certainly, the starkness of knowing one is dying from a dread disease is a reality that would cause one to be angry, and depressed and concerned. But that reality, in this case, does not prove deliberate indifference on the part of one whose duty it is to discern and treat the most needy among hundreds of mentally ill patients, as the testimony shows was the situation existing in the Luzerne County Prison during the time of the Decedent's confinement.

■ At best, we find, the Plaintiff makes out a case of repeated requests, but there is no credible evidence that failure to honor these requests was due to deliberate indifference or that such failure caused the Decedent's problems. Even the expert testimony is divided on the appropriateness of the Defendant's actions—and we find no cause to accept the Plaintiff's expert testimony any more than that of the Defendant's expert testimony. Thus, we decide on the basis of the general facts of the case that Defendant made a responsible professional judgment

---

7. Hetzel's complaint, including misspellings, states in full:

> I was seen by Jim Swartz in our Syke Dept. He disclosed privaged information to Doctor without my permission. He also told me he would get & give me copys of my medical records. I signed the release under this belief He would do as he said. I learned he had received my medical records and I wrote to him in request to please see me on the medical records. I have sent many request slips to him. I also through request & conversation the problem I was having trying to see Jim Swartz I brought this to the attention of the warden, lieutenants of Institution sergeants, head counselor for the jail my counselor and told them I wanted to see Jim Swartz. They in turn told me he was going to see me. As to date I have not seen him on this matter or any other matter as he will not see me or answer my request form. I am in need of counselor help as I am terminally ill and don't know how long I'll live. He has told prison officers and head counselors. He has never seen me so I believe it has to do with my medical condition but I feel he has denied me counseling. I believe he got my medical records on false pretense and because of the fact that my records are to be kept or used to help me. He has not seen me since he received records. I have been in great distress over these records and not getting any counseling from the people here that are suppose to help me. My jail counselor Joe Moratory knows that he is not a Syke counselor and has sent reguller requests to the syke dept no results. I feel I have suffered greatly and I am under mental strain because of the action of counselors from Syke Dept. I would like to get some counseling from some one other than Jim Swartz because of feeling I have towards his lack of interest. I do feel I am entitled to some monetary compensation to in money so maybe I could leave my family something. This has been a very hard time on me because of finding out I have this terminal disease and I've been under unfair stress & strain from this and it is the worst thing that can happen with this sickness is to be stressed out and these professional people act & do things like this. (Doc. 1).

regarding the treatment of Decedent Roy Hetzel, and consequently that Plaintiff has failed to prove deliberate indifference to the Decedent's needs on the part of Defendant Swartz.

We find believable the testimony that the Defendant had as many as 100 patients at a time—and that it was reasonable and necessary to make decisions on the most needy among them. We find no proof that such decisions were improperly made or in any way adversely impacted the Decedent in this case.

The issue of the alleged privacy violation is more straightforward, and requires less analysis.

■ We find the credible testimony shows the Defendant revealed information in the Decedent's records covered by the Act, only to appropriate and allowable persons, namely the doctor in charge and the head nurse at the Luzerne County Prison Infirmary. There is absolutely no testimony or evidence which shows that the Defendant released information to anyone in violation of the Act or the agreement signed by the Decedent and Defendant. In fact, neither the Plaintiff nor her witness was able to provide the Court with the name of any individual, other than the Defendant, Dr. Hartman and the head nurse, who was aware of the Decedent's condition.

Under the circumstances, we find that the Plaintiff failed to produce any proof whatsoever that there is any violation of the Decedent's right of privacy governed by the statute or the Constitution of the United States.

Accordingly, based on the above analysis, We shall enter a verdict in favor of the Defendant, Jim Swartz.

### ORDER

NOW, this 29th Day of December, 1998, it is hereby ORDERED that:

1. A verdict is entered in favor of the Defendant, Jim Swartz.

2. The Clerk of Court is directed to close this case.