Joseph D. KOUTNIK, Plaintiff,

v.

Lebbeus BROWN, Defendant.

No. 04–C–911–C.

United States District Court,
W.D. Wisconsin.

Nov. 2, 2005.

Joseph D. Koutnik, pro se.

Mary Batt, Assistant Attorney General, Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

In September 2004, Joseph Koutnik, an inmate at the Wisconsin Secure Program Facility, attempted to mail a letter and a drawing to a person outside the prison. Defendant Lebbeus Brown denied delivery of the letter and drawing on the ground that they contained encoded references to a gang and gang activities. Plaintiff subsequently brought this civil action under 42 U.S.C. § 1983, alleging that Brown had violated his First Amendment rights. Jurisdiction is present. 28 U.S.C. § 1331.

This matter is before the court on cross motions for summary judgment filed by the parties. Because defendant has shown that the censorship of plaintiff's letter and drawing was generally necessary to further the substantial governmental interests in prison security and plaintiff's rehabilitation, I will grant defendant's motion and deny plaintiff's motion.

From the proposed findings of fact and the record, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

### A. *Parties*

At all times relevant to this action, plaintiff Joseph Koutnik was an inmate at the Wisconsin Secure Program Facility in Boscobel, Wisconsin. Koutnik is a self-admitted member of the Simon City Royals.

At all times relevant to this action, defendant Lebbeus Brown was employed as a Supervising Officer 2, or Captain, at the same facility. Defendant has been employed at the facility since July 2000 and has been the disruptive groups coordinator at the facility since April 3, 2003. In this position, his duties include tracking disruptive groups and their members in the institution, instructing staff on gang identification and management techniques and meeting with disruptive groups coordinators from other Department of Corrections institutions. Defendant has had training and experience in gang related prison security issues.

### B. *First Amendment Claim*

Inmates at the Wisconsin Secure Program Facility must submit unsealed, non-legal outgoing mail for inspection before it is delivered to the United States Postal Service. On September 2, 2004, defendant examined outgoing mail submitted by plaintiff that was intended for delivery to Jimmy Velioski, a non-prisoner living in Waupun, Wisconsin. The correspondence included a letter, a poem and a drawing. The drawing is of a clock face showing the numbers 6, 12, 18 and 24 where the numbers 3, 6, 9 and 12 would be respectively on an ordinary 12–hour clock. In between the 6, 12, 18 and 24 are evenly spaced dots corresponding to each hour between 6, 12, 18 and 24. A thin banner angles across the face of the clock bearing the words, "hard times." Below the banner three prison cell bars are drawn. Above the banner the clock's hour hand points to the dot immediately after the number 18, corresponding to the 19th hour on the clock, the minute hand points to the third dot from the top when counting clockwise, corresponding to the 3rd hour on the clock and the second hand points to the number 18. In small lettering following the circumference of the clock the following words are written "Mister Kujo The Watchdog In The Shadow."

The letter "S" is the 19th letter of the alphabet, the letter "C" is the 3rd letter, and the letter "R" is the 18th letter. Based on his training and experience as disruptive groups coordinator, defendant

understands "SCR" to be the initials of the gang the Simon City Royals.[1] In and of itself, a clock is not a symbol of the Simon City Royals and "watchdog" is not a specific position within the Simon City Royals. "Kujo" is plaintiff's nickname, "watchdog" is a protector and "in the shadow" is prison jargon for one who is incarcerated. Plaintiff believes that "watchdog in the shadow" describes the way he sees himself as a prisoner who is a protector of prisoner rights. However, when defendant saw the drawing, he interpreted it to mean that plaintiff was identifying with the Simon City Royals and trying to promote its growth. Defendant interpreted the clock hands as pointing to places on the clock that represent the letters "SCR," for Simon City Royals. He understood the term "watchdog in the shadow" to mean that plaintiff was professing to be a guardian or protector of the Simon City Royals even though he was in prison.

On September 2, 2004, defendant issued plaintiff a "Notice of Non–Delivery of Mail" form DOC–243. On this form is a section with the heading "Item rejected for delivery." In this section, defendant typed: "1–embossed envelope," "3–page letter and drawing" and "[t]he letter would violate 309.04(4)[ (c) ]10 [and] 303.20 Noted in behavior log." The form also contains a checklist of reasons for non-delivery. Defendant checked the box reading "[i]tem concerns an activity which, if completed would violate the laws of Wisconsin, the United States or the Administrative Rules of the Department of Corrections." On September 5, 2004, defendant made the following entry on plaintiff's Behavioral Incident Form:

> On 8/29/04 Koutnik sent a letter out to Jimmy Velioski which he received NOND 4697. In the letter he writes Brew are good brothers which is a group of Simon City Royals a disruptive group and their leader SS or spanky. He also used a drawing 24 hour clock with the hands pointing to (19, 3, 18) which SCR, the same as his tattoos standing for Simon City Royals. Koutnik drew symbols to show this affiliation to the SCR. Demoted to level 2.

Simultaneously, defendant demoted plaintiff from Level 3 to Level 2 in the Facility's "level program."

The Simon City Royals is an "unsanctioned group" as defined in Wis. Admin. Code § 309.365. Inmate gangs and unsanctioned groups can be detrimental to prison security and order and can also compromise an inmate's chances for rehabilitation. Suppressing gang activity furthers the Department of Corrections' interest in security because gangs provide a support network for inmates who resist prison authority. Gang members threaten, coerce and harass others and engage in or encourage illegal or illicit activities. Also, individual gang members are physically endangered by the presence of rival

1. Plaintiff has attempted to put the nature of the Simon City Royals into dispute by submitting the affidavit of a Daniel Schleicher, who avers he is a member of the "fraternity" known as the Simon City Royals and that the Milwaukee chapter of the group is not affiliated with any other Simon City Royals group. That the Milwaukee chapter is not affiliated with any other Simon City Royals organization is not a fact sufficient to put into dispute defendant Brown's understanding that the Simon City Royals is a gang. In any event, I have already held in another of plaintiff's cases that the Simon City Royals is a gang. *Koutnik v. Berge*, No. 03–C–345–C, 2004 WL 1629548, at *2 (W.D.Wis. July 19, 2004). In that case, the undisputed facts revealed that the Department of Corrections and the Milwaukee City Police Department have identified the Simon City Royals as a gang with an extensive history of drug trafficking and that members of the gang are incarcerated throughout the Wisconsin prison system.

groups. Managing gang activity reduces the number of violent incidents in prisons.

One reason inmates are transferred to the Wisconsin Secure Program Facility is to remove them from adverse gang influences at other institutions so that they can concentrate on rehabilitation. An inmate's rehabilitation can be compromised by his association with gangs because gangs are antisocial, resist prison authority and are frequently involved in criminal activities. The goal is to rehabilitate inmates and reintegrate them into the general populations at less restrictive institutions.

Prison officials monitor and manage gang activity by educating corrections staff, conducting searches of inmate property and living areas, monitoring telephone conversations and screening incoming and outgoing mail. Although prison officials permit inmates at the facility to correspond with anyone through the mail, non-legal mail is monitored closely and is censored pursuant to Wis. Admin. Code § DOC 309.04(4)(c) if it is deemed to teach or advocate activity consistent with a gang.

## OPINION

### A. *Preliminary Matters*

Before addressing the merits of the parties' cross motions, I must address plaintiff's request that the court disregard defendant's testimony because he did not disclose himself as an expert in a timely manner. Also, I must address plaintiff's contention that the opinions defendant has advanced regarding the rehabilitation of inmates are beyond defendant's realm of knowledge and therefore should be disregarded. For the reasons stated below, I reject both of these arguments.

■ Federal Rule of Civil Procedure 26(a)(2)(A) provides that each party must disclose to the other party the identity of any person who may be used at trial to present expert evidence. This disclosure must be done in accordance with a schedule set out by the court. Fed.R.Civ.P. 26(a)(2)(C). Federal Rule of Civil Procedure 37(c)(1) provides that a "party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." However, a trial court has "broad discretion" to decide whether a failure to timely disclose an expert witness is justified or is harmless error. *Miksis v. Howard,* 106 F.3d 754, 760 (7th Cir.1997); *Finley v. Marathon Oil Co.,* 75 F.3d 1225, 1231 (7th Cir.1996).

In this case, the court's scheduling order required defendant to disclose any expert witnesses by July 22, 2005. Scheduling Order, March 29, 2005. On September 21, 2005, defendant submitted his expert disclosure, disclosing himself as the only potential expert witness.

■ In deciding whether an untimely disclosure of an expert is harmless, four factors guide my discretion: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir.2003).

■ In this case, plaintiff cannot claim surprise or prejudice in not receiving timely notice of defendant's disclosure of himself as a potential expert witness. Plaintiff knew that because defendant is a party to the case, his testimony would be important. Further, he knew the substance of defendant's testimony. When defendant disclosed himself as a potential expert witness on September 21, 2005, he did not

add any new evidence or opinions. Rather, he merely referred to the affidavit he had filed in support of his motion for summary judgment on August 5, 2005, which established his qualifications and set forth his opinions. Because plaintiff was aware of the content of defendant's affidavit and had an opportunity to respond to it, he cannot claim prejudice or surprise by defendant's late disclosure. This means there is no prejudice to be cured. Nor is there a likelihood of disruption of trial because trial was still nearly 3½ months away at the point defendant made his expert disclosure. This is not an instance where an expert witness is disclosed three days before trial. *See, e.g., Miksis,* 106 F.3d at 760 (not allowing expert testimony from expert who was disclosed just before trial). Last, plaintiff does not argue that defendant's failure to timely disclose was motivated by bad faith. Even if he had made such an argument, the factor would not be determinative because plaintiff suffered no prejudice. Because late disclosure of defendant as a potential expert witness is therefore harmless, I have considered all of defendant's "expert" opinions in deciding this motion.

Also, I reject plaintiff's contention that defendant is unqualified to express any opinions regarding an inmate's rehabilitation. It is undisputed that defendant has many years of training and experience in gang identification, prison security and tracking disruptive groups and activities. In his training and experience, defendant has learned that gang activity threatens the safety and welfare of prisoners and that gang members threaten, coerce and harass others and engage in and encourage illegal or illicit activities. Also, defendant has worked at the Wisconsin Secure Program Facility for five years. As an employee of this institution, defendant has personal knowledge of its mission to provide inmates with an environment away from gang influences and other adverse factors so that inmates can concentrate on rehabilitation. As an employee of the Wisconsin Secure Program Facility and as an experienced disruptive groups coordinator, defendant may testify to the logical proposition that the institution's rehabilitative goals require inmates to sever all connections with gangs and gang activities. Indeed, common sense indicates that it would be detrimental to an inmate's rehabilitation to be affiliated with a group that engages in violent, antisocial, illegal or illicit activities. Defendant may rely on his knowledge of the institution's mission and on his experience with gang behavior to support his assertion that it is detrimental to an inmate's rehabilitation for prison officials to allow advocacy of gang activity or behavior by a prisoner.

### B. *First Amendment Claim*

#### 1. *Standard of review*

The First Amendment's guarantee of freedom of speech provides protection against censorship of a prisoner's incoming and outgoing correspondence. *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir.1999) (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)). However, "the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence." *Procunier v. Martinez,* 416 U.S. 396, 412–413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The Supreme Court has articulated two standards of review for First Amendment claims regarding interference with prisoner's mail. For incoming mail or mail within the prison system, a court will uphold regulations or actions restricting inmate mail if they are "reasonably

related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254. However, the Supreme Court has articulated a less deferential standard for reviewing censorship of outgoing prisoner mail. In order to legitimately censor outgoing mail, prison officials must show two things. First, "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Martinez,* 416 U.S. at 413, 94 S.Ct. 1800. Second, "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* The less deferential *Martinez* analysis is limited to outgoing mail because the "implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh,* 490 U.S. at 413, 109 S.Ct. 1874. However, the Court noted that security, order and rehabilitation are all substantial governmental interests. *Id.* Though some courts have questioned the necessity or practicality of using two standards, lower courts continue to apply the separate standards. *See, e.g., Nasir v. Morgan,* 350 F.3d 366, 371 (3d Cir.2003) (questioning continuing viability of *Martinez* in any context but nonetheless applying it to regulation restricting outgoing mail). Therefore, I will analyze plaintiff's claim using the standard set out in *Martinez.*

### 2. *Analysis under Martinez standard*

■ The first consideration under *Martinez* is whether defendant has shown that his decision to censor plaintiff's mail furthered a substantial governmental interest unrelated to the suppression of expression and was reasonably necessary to protect the identified government interest. Defendant relied on two regulations to censor plaintiff's mail: Wis. Admin. Code §§ DOC 303.20 and 309.04(4)(c)(10). Plaintiff argues that those regulations have been applied unconstitutionally.[2]

Section DOC 309.04(4)(c)(10) permits prison officials to refuse to deliver incoming or outgoing mail that "teaches or advocates illegal activity, disruption, or behavior consistent with a gang or a violent ritualistic group." Applying the first part of the *Martinez* test to this regulation, I find that § DOC 309.04(4)(c)(10) furthers important or substantial governmental interests in security and rehabilitation.

In *Thornburgh,* 490 U.S. at 413, 109 S.Ct. 1874, the Supreme Court recognized that security, order and rehabilitation are all substantial governmental interests. The regulation and suppression of gang activity have been specifically recognized as legitimate penological interests related to security and rehabilitation. *See, e.g., Thornburgh,* 490 U.S. at 413, 109 S.Ct. 1874; *Rios,* 812 F.2d at 1037 ("it is difficult

2. When I screened plaintiff's complaint, I granted him leave to proceed *in forma pauperis* on his claim that "defendant Lebbeus Brown violated his rights under the First Amendment by refusing to deliver plaintiff's letter on September 2, 2004 and by disciplining him for writing the letter on September 5, 2004." I denied plaintiff leave to proceed on a claim that "Wis. Admin. Code § DOC 303.20 is unconstitutional on its face or as applied," on the ground that I had considered those questions in another of plaintiff's cases, *Koutnik v. Brown,* No. 04–C–580, and had

found in favor of the defendants. Obviously, it was a misstatement to suggest I was denying plaintiff leave to proceed in this case on an "as applied" challenge to the regulations at issue simply because on another occasion with another set of facts I determined that § 303.20 had not been unconstitutionally applied. The parties have wisely ignored this misstatement and have treated plaintiff's claim as a challenge to the constitutionality of defendant's application of Wis. Admin. Code §§ 303.20 and 309.04(4)(c)10 to censor plaintiff's September 2 communication.

to conceive of a single factor more detrimental to penological objectives than organized gang activity"). In this case, the facts reveal that defendant applied § DOC 309.04(4)(c)(10) to thwart plaintiff's ability to communicate his association with a gang. The facts confirm also that gangs undermine institutional security by providing a support network for inmates who resist prison authority. Gang members threaten, coerce and harass others and engage in or encourage illegal or illicit activities. Individual gang members are physically endangered by the presence of rival groups. Managing gang activity reduces the number of violent incidents in prisons. Moreover, defendant has shown that one reason inmates are transferred to the Wisconsin Secure Program Facility is to remove them from adverse gang influences at other institutions so that they can concentrate on rehabilitation and that an inmate's rehabilitation is compromised by his association with gangs because gangs are antisocial, resist prison authority and are frequently involved in criminal activities. Although it is generally recognized that allowing inmates to maintain contact with family, friends and supportive groups outside the prison is in the best interests of a prisoner's rehabilitation, this does not extend to maintaining affiliations with gangs. *Martinez*, 416 U.S. at 412–13, 94 S.Ct. 1800 ("While the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation, the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restrains on inmate correspondence").

■ Although regulations that allow censorship of merely embarrassing or unflattering speech do not further the government's substantial interests related to security or rehabilitation, *Martinez*, 416 U.S. at 416, 94 S.Ct. 1800 (striking regulations that allowed the censorship of complaints, grievances, and inflammatory political and racial views), this is clearly not the purpose of § DOC 309.04(4)(c)(10). Indeed, plaintiff does not argue that § DOC 309.04(4)(c)(10) fails to further the substantial governmental interests in security and rehabilitation. Instead, he argues that the regulation should not have been applied to his correspondence because in his view, his outgoing letter did not create a security risk. Plt.'s Br., dkt. # 22, at 4 ("Koutnik takes no issue with this regulation [§ DOC 309.04(4)(c)(10)] when applied correctly.").

■ It is true that the "implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh*, 490 U.S. at 413, 109 S.Ct. 1874. However, the Supreme Court has recognized that substantial governmental interests of security, order and rehabilitation can be threatened even in the context of outgoing prisoner mail. *Martinez*, 416 U.S. at 413, 94 S.Ct. 1800. Courts have ruled that censorship of outgoing mail is valid primarily to restrict contraband material or to limit speech related to escape plans, criminal activity, threats of blackmail or extortion or certain encoded messages. *Martinez*, 416 U.S. at 413, 94 S.Ct. 1800; *Thornburgh*, 490 U.S. at 412, 109 S.Ct. 1874; *Rowe*, 196 F.3d at 782. However, the Court has cautioned lower courts to refrain from unduly limiting the discretion of prison officials to reject outgoing mail. Rather, courts must ask only whether the restrictions are "generally necessary" to protect the interests at stake. *Thornburgh*, 490 U.S. at 412, 109 S.Ct. 1874.

■ Plaintiff argues that censorship of his letter was not "generally necessary" to protect the government's interest in prison

security because his communication did not contain specific threats or evidence of criminal behavior. However, prison officials have every right to censor mail to the extent needed to prevent inmates from helping run, direct or support outside illegal activities, including outside gang activity. As the Supreme Court noted recently, gangs pose broad implications for safety both inside and outside prisons:

> Clandestine, organized, fueled by race-based hostility, and committed to fear and violence as a means of disciplining their own members and their rivals, gangs seek nothing less than to control prison life and to extend their power outside prison walls. Murder of an inmate, a guard, or one of their family members on the outside is a common form of gang discipline and control, as well as a condition for membership in some gangs.

*Wilkinson v. Austin,* —— U.S. ——, ——, 125 S.Ct. 2384, 2396, 162 L.Ed.2d 174 (2005) (internal citations omitted). I am persuaded that defendant's application of § DOC 309.04(4)(c)(10) to correspondence encoding gang affiliation is generally necessary to protect the government's interest in a secure prison.

Plaintiff argues that his communication was not properly censored under § DOC 309.04(4)(c)(10) because he was not "teaching" or "advocating" illegal or gang-related behavior. However, this argument is unpersuasive. There are ample undisputed facts in the record of this case to support defendant's conclusion that plaintiff's letter contained specific gang-related references and symbols and that this was sufficient to consider plaintiff to be "advocating" gang-related behavior. Plaintiff's view that the Simon City Royals is not a gang and that the clock hands in his drawing were not intended to convey anything other than the time is irrelevant to the determination whether defendant properly censored plaintiff's mail. Defendant Brown's view is the view entitled to deference, even if I disagreed with it. *Bell v. Wolfish,* 441 U.S. 520, 547–548, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (prison officials "should be accorded wide-ranging deference" in matters of institutional security and order). Brown is uniquely trained to track disruptive groups in the Wisconsin prison system, identify gang members and insure that gang messages are decoded and intercepted. His conclusions regarding plaintiff's drawings were grounded in his undisputed knowledge and expertise in the area of prison gangs and security. Brown concluded that the hands on plaintiff's drawing pointed to places on the clock that represented the numbers 19, 3, 18, corresponding with the letters SCR, which are the initials of the Simon City Royals. Moreover, although the word "advocate" is not defined in the Wisconsin Administrative Code, it means generally only that one be a "supporter or defender" of a cause. *The American Heritage Dictionary of the English Language* 26 (4th ed.2000). The fact that Brown understood plaintiff's drawing to refer to plaintiff's allegiance to the Simon City Royals and his desire to protect them was sufficient to support his conclusion that plaintiff was supporting and defending the Simon City Royals. In sum, the facts clearly support defendant's interpretation that plaintiff's drawing contained gang references and that his censorship of plaintiff's mail was a legitimate restriction on speech that reasonably related to the prison's interests in maintaining security and promoting plaintiff's rehabilitation.

In applying the second part of the *Martinez* analysis, I conclude that the decision to censor plaintiff's mail was no greater an infringement on plaintiff's First Amendment liberties than was necessary to protect the state's interests in security and

rehabilitation. Plaintiff is free to correspond with anyone he wishes and to rewrite his letter to Velioski so long as he omits the gang-related references. Reading through inmate mail and censoring only that mail that presents specific threats to the institution's rehabilitative and security goals does not sweep too broadly and is a valid, limited constraint on plaintiff's freedom of speech.

■ Plaintiff's argument that defendant's censorship swept too broadly because defendant demoted plaintiff in the facility's level system in addition to censoring the offending piece of mail misses the point. The question whether a restriction on First Amendment freedoms sweeps too broadly relates to the broadness of the censorship, not the type of consequences that may flow from making unprotected speech. A regulation or practice of censoring may be too broad when it is not "generally necessary to protect one or more [ ] legitimate governmental interests." *Martinez*, 416 U.S. at 414. Arguing that the consequences of making the speech were too broad does not address this issue.

Because I conclude that defendant's censorship of plaintiff's mail was constitutional under § 309.04(4)(c)(10), it is not necessary to decide whether the censorship was proper as well under § DOC 303.20.

### ORDER

IT IS ORDERED that the motion for summary judgment filed by defendant Lebbeus Brown is GRANTED and the motion for summary judgment filed by plaintiff Joseph Koutnik is DENIED. The clerk of court is directed to enter judgment for defendant and close this case.